Case No. 24-1002

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

COLUMBIA RIVERKEEPER AND ROGUE CLIMATE,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION.,
*Respondent*.

FERC Orders Under Review:
Order Issuing Certificate 185 FERC 61,035 (Oct. 23, 2023);
Notice of Denial of Rehearing Request (Dec. 26, 2023)

---

## PETITION FOR REVIEW

---

*Counsel for Columbia Riverkeeper and Rogue Climate*

Jan Hasselman
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7430 | Phone
Email: jhasselman@earthjustice.org

Pursuant to Section 19(b) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(b), Rule 15(a) of the Federal Rules of Appellate Procedure, and Circuit Rule 15, Columbia Riverkeeper and Rogue Climate (collectively, "Petitioners") hereby petition for review of the following orders of the Federal Energy Regulatory Commission:

1.    Gas Transmission Northwest LLC, 185 FERC ¶ 61035 (Oct. 23, 2023) (attached as Exhibit 1).

2.    Gas Transmission Northwest LLC, 185 FERC ¶ 62,169 (Dec. 26, 2023) (attached as Exhibit 2).

Petitioners timely sought rehearing of the Commission's certificate order on November 22, 2023.[1] On December 26, 2023, FERC issued a notice of denial of rehearing "by operation of law" that provided that "the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order." 185 FERC ¶ 62,169.

Petitioners and their members have been, and will be, adversely affected by the construction and operation of the proposed project and appurtenant facilities. This Court has jurisdiction and is a proper venue under 15 U.S.C. § 717r(b) as that statute specifically provides for venue in this Circuit.

---

[1] The rehearing request is dated Nov. 21, 2023, but was not deemed filed with FERC until Nov. 22, 2023, pursuant to FERC rules.

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26, Petitioner has provided a corporate disclosure statement. In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, Petitioner has served parties that may have been admitted to participate in the underlying proceedings with a copy of this Petition for Review. As required by Local Rule 15(b), a list of Respondents specifically identifying Respondents' names and addresses is attached. Petitioner has sent copies of the Petition for Review and exhibits via U.S. first-class certified mail, return receipt requested, to the clerk for service on Respondent as required by Federal Rule of Appellate Procedure 15(c)(3).

Petitioners respectfully request that this Court vacate the challenged Order because it is in violation of the Natural Gas Act, 15 U.S.C. § 717 *et seq*., National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., and is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

Respectfully submitted this 4th day of January, 2024.

*s/Jan E. Hasselman*
Jan Hasselman
Earthjustice
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7430 | Phone
Email: jhasselman@earthjustice.org

2

*Counsel for Columbia Riverkeeper and*
*Rogue Climate*

## DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner makes the following disclosures:

Columbia Riverkeeper and Rogue Climate are non-profit 501(c)(3) organizations incorporated under the laws of Washington and Oregon respectively. Columbia Riverkeeper and Rogue Climate are non-profit corporations and, as such, no entity has any ownership interest. Columbia Riverkeeper and Rogue Climate do not have any outstanding shares or debt securities in the hands of the public nor any parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

DATED: January 4, 2024

*s/Jan E. Hasselman*
Jan Hasselman

# LIST OF RESPONDENTS

As required by Local Rule 15(b), Petitioners provide a list of Respondents below specifically identifying the Respondent's name and addresses where Respondent and/or its counsel may be served with copies of this Petition for Review.

Debbie-Anne A. Reese
Acting Secretary
Robert H. Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Room 9A-01
Washington, D.C. 20426
*Counsel for Respondent Federal Energy Regulatory Commission*

## CERTIFICATE OF SERVICE

I certify that on January 4, 2024, the foregoing was electronically filed through this Court's CM/ECF system.

I further certify that the foregoing has been served on the following, who are counsel for the Commission and the representatives for all parties admitted to the proceedings below:

*Via FedEx or Courier:*

Debbie-Anne A. Reese
Acting Secretary
Robert H. Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Room 9A-01
Washington, D.C. 20426
*Counsel for Respondent Federal Energy Regulatory Commission*

*Via U.S. First Class Mail, postage prepaid and/or email:*

Sean Marotta
Zachary Launer
Stefan Krantz
Kevin M. Downey
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com
*Gas Transmission Northwest, LLC*

Megan Sallomi
Washington State Attorney General's Office
800 Fifth Ave.
Suite 2000
Seattle, WA 98104-3188
megan.sallomi@atg.wa.gov
*State of Washington*

Paul Garrahan
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
*State of Oregon*

Adrianna Lobato
California Department of Justice
1300 I Street
Sacramento, CA 95814
*State of California*

Sherra Aspin
Deanna Kruk
3700, 250 6th Ave. SW
Calgary, Alberta T2P 3H7 Canada
*Tourmaline Oil Marketing Co.*

James Holt
Katherine Ann Wade
Betts & Holt LLP
1101 Connecticut Avenue, N.W.
Suite 450
Washington, D.C. 20036
*Canadian Association of Petroleum Producers*

Lindsey How-Downing
3060 El Cerrito Plz #175
El Cerrito, CA 94530-4011
*Pacific Gas and Electric Company*

Pamela Anderson
Perkins Coie
10885 N.E. Fourth St.
Suite 700
Bellevue, WA 98004-5579
*Puget Sound Energy, Inc.*

Matthew Agen
400 North Capitol St., N.W.
#450
Washington, D.C. 20001
*American Gas Association*

Morgan Johnson
1152 15th St.. N.W.
Suite 300
Washington, D.C. 20005
*Natural Resources Defense Council*

Nathan Matthews
2101 Webster St.
Suite 1300
Oakland, CA 94612
n.d.matthews@gmail.com
*Sierra Club*

Jason Rylander
1411 K St., N.W.
Suite 1300
Washington, D.C. 20005
jrylander@biologicaldiversity.org
*Center for Biological Diversity*

                                        *s/Jan E. Hasselman*
                                        Jan Hasselman

8

# EXHIBIT 1

185 FERC ¶ 61,035
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
                       James P. Danly, Allison Clements,
                       and Mark C. Christie.

| | |
|---|---|
| Gas Transmission Northwest, LLC | Docket No. CP22-2-000 |

ORDER ISSUING CERTIFICATE

(Issued October 23, 2023)

1.      On October 4, 2021, Gas Transmission Northwest LLC (GTN) filed an application in Docket No. CP22-2-000, under section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations,[2] for authorization to install, construct, modify, and operate certain natural gas compression facilities at the existing No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations, located in Kootenai County, Idaho, Walla Walla County, Washington, and Sherman County, Oregon, respectively (GTN XPress Project).  The project is designed to enable GTN to provide an additional 150,000 dekatherms per day (Dth/d) of firm transportation service on its mainline system.  As discussed below, we grant the requested authorization, subject to certain conditions.

## I.   **Background and Proposal**

2.      GTN,[3] a Delaware limited liability company, is a natural gas company, as defined by section 2(6) of the NGA,[4] engaged in the transportation of natural gas in interstate commerce and subject to the Commission's jurisdiction.  GTN owns and operates a natural gas pipeline system extending from the Idaho border with British Columbia, through Washington, to the Oregon-California border.

3.      GTN states that there is rising demand for natural gas in the Pacific Northwest, driven by residential, commercial, and industrial customer market growth.  Additionally, it states that West Coast markets served by Rocky Mountain supply basins need an

---

[1] 15 U.S.C. § 717f(c).

[2] 18 C.F.R. pt. 157 (2022).

[3] GTN is a wholly owned direct subsidiary of TC Pipelines, LP.

[4] 15 U.S.C. § 717a(6).

**Exhibit 1**
**Page 1 of 79**

alternative source of gas for reliability purposes, as production in the Rockies has declined. Further, the alternate sources of natural gas will allow natural gas consumers to access lower-cost natural gas supplies. Therefore, GTN proposes the GTN XPress Project, to provide 150,000 Dth/d of incremental firm transportation service from its Kingsgate Meter Station, located at the Idaho border with British Columbia, Canada, to its Malin Meter Station, in Klamath County, Oregon. To increase the capacity of its system, GTN proposes to modify existing compression facilities at its No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations.[5]

4.     Specifically, GTN proposes to:

- modify the existing No. 5 Athol Compressor Station, located in Kootenai County, Idaho, to increase the total certificated horsepower (HP) from 49,300 International Organization Standardization (ISO) HP to 58,470 ISO HP by uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls;

- modify the existing No. 7 Starbuck Compressor Station, located in Walla Walla County, Washington, to increase the total certificated horsepower from 54,000 ISO HP to 86,640 ISO HP by (a) installing a new 23,470 ISO HP Solar Turbine Titan 130 gas-fired turbine compressor and related appurtenant facilities, including piping, (b) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls, and (c) installing three additional gas cooling bays and associated piping; and

- modify the existing No. 10 Kent Compressor Station, located in Sherman County, Oregon, to increase the total certificated horsepower from 47,900 ISO HP to 57,070 ISO HP by (a) uprating an existing Solar Turbine Titan 130 gas-fired turbine compressor from 14,300 ISO HP to 23,470 ISO HP by reprogramming the unit's software controls and (b) installing auxiliary facilities including four additional gas cooling bays and associated piping.

5.     GTN states that it held a binding open season and request for turnback capacity from July 31, 2019, to September 6, 2019. As a result of the open season, GTN signed precedent agreements with three shippers, Cascade Natural Gas Corporation (Cascade), Intermountain Gas Company (Intermountain), and Tourmaline Oil Marketing Corporation (Tourmaline), for the entire 150,000 Dth/d of firm transportation service attributable to the expansion facilities. The primary terms for the precedent agreements

---

[5] GTN Application at 3-5.

**Exhibit 1**
**Page 2 of 79**

range from 30 to 33 years at negotiated rates.[6]  GTN did not receive any offers for turnback capacity.

6.      The estimated cost of the GTN XPress Project is $75,138,691.[7]  GTN proposes to use its existing system recourse reservation and commodity rates under Rate Schedule FTS-1 as the initial maximum recourse charges for transportation service.[8]  GTN also requests a predetermination that it may roll the project costs into its existing rates in a future NGA section 4 rate case.[9]

## II.    Procedural Matters

### A.    Notice, Interventions, and Comments

7.      The Commission issued public notice of GTN's application on October 19, 2021.[10]  The notice established November 9, 2021, as the deadline for filing comments and interventions.  The following entities filed timely, unopposed motions to intervene: Tourmaline Oil Marketing Corporation, Canadian Association of Petroleum Producers, Pacific Gas & Electric Company (PG&E), and the American Gas Association.[11]  Puget Sound Energy, Inc. (PSE) and Columbia Riverkeeper filed late, opposed,[12] motions to intervene, which were granted by notice.[13]  Rogue Climate filed a late, unopposed, motion to intervene that was granted by notice.[14]  On August 22, 2022, during the

---

[6] *Id.* at 7-8.

[7] *Id.* at 8 & Ex. K.

[8] *Id.* at 14.

[9] *Id.* at 13.

[10] Notice of the application was published in the *Federal Register* on October 25, 2021.  86 Fed. Reg. 58,902 (Oct. 25, 2021).

[11] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2022).

[12] The motions to intervene were opposed by GTN.

[13] Secretary's February 8, 2022 Notice Granting Late Interventions.

[14] Secretary's April 5, 2022 Notice Granting Late Intervention.

**Exhibit 1**
**Page 3 of 79**

comment period for the draft EIS, the States of Washington, Oregon, and California filed a joint motion to intervene.[15]

8.    As discussed further below, the Commission received numerous comments from individuals and groups regarding various issues.  Commenters in support of the project assert that the project will provide benefits such as meeting increased demand, enhancing system reliability, increasing access to lower priced natural gas, and supporting jobs. Commenters in opposition to the project raise issues including project purpose and need; alternatives; the request for a predetermination of rolled-in rate treatment; air quality; noise; socioeconomic impacts; environmental justice; cumulative impacts; safety; greenhouse gases (GHG); and climate change.  These concerns are addressed in the final Environmental Impact Statement (EIS) and/or below.

### B.    Answers

9.    On December 16, 2021, GTN filed an answer to PG&E's and PSE's protests regarding GTN's request for a predetermination of rolled-in rate treatment, discussed further below.  On December 28, 2021, PSE filed an answer to GTN's answer. Additionally, on September 6, 2022, GTN filed an answer to Washington, California, and Oregon's joint protest.

10.    The Commission's Rules of Practice and Procedure prohibit answers to protests and answers to answers unless ordered by the decisional authority.[16]  However, we will accept the answers here because they provide information that has assisted in our decision making.

### C.    Request for a Technical Conference

11.    PG&E requests a technical conference to address issues related to GTN's request for a predetermination of rolled-in rate treatment.  As demonstrated by the discussion

---

[15] See 18 C.F.R. §§ 157.10(a)(2), 380.10(a)(1)(i) (2022) (providing that motions to intervene on environmental grounds filed during a draft environmental impact statement (EIS) comment period are deemed timely).  Washington, Oregon, and California became party to the proceeding at the close of the 15-day opposition period.  On September 21, 2022, GTN opposed the States' motion.  Because oppositions to motions to intervene must be filed within 15 days after the motion to intervene is filed, 18 C.F.R. § 385.214(c)(1), GTN's opposition was not timely.

[16] 18 C.F.R. § 385.213(a)(2) (2022).

**Exhibit 1**
**Page 4 of 79**

below, the existing written record provides enough basis to resolve the issues relevant to the proceeding.[17]  Therefore, we deny PG&E's request.

## III.  Discussion

12.    Because the proposed facilities for the GTN XPress Project will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities and capacity are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[18]

### A.    Certificate Policy Statement

13.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[19]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that, in deciding whether to authorize the construction of new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

14.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new

---

[17] *See Trunkline Gas Co., LLC*, 147 FERC ¶ 61,041, at P 27 (2014) (rejecting a request for a technical conference and finding that there was no material issue of fact that could not be resolved on the basis of the written record in the proceeding).

[18] 15 U.S.C. § 717f(c), (e).

[19] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).  On March 24, 2022, the Commission issued an order converting the policy statements issued in February 2022 to draft policy statements.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197 (2022) (Order on Draft Policy Statements).

**Exhibit 1**
**Page 5 of 79**

pipeline facilities. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### 1.     No Subsidy Requirement

15.     As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers. Washington, Oregon, and California argue that GTN's existing customers will subsidize the project because the costs of previous compressor unit replacements at the Athol, Kent, and Starbuck compressor stations, which were constructed in prior notice proceedings, [20] are not included in the GTN XPress Project costs. GTN responds that the previous compressor unit replacements were carried out under section 2.55 of the Commission's regulations and are appropriately excluded from the GTN XPress Project costs.[21]

16.     At each location GTN replaced a Rolls Royce Avon compressor unit (roughly, 14,500 HP) with a Solar Titan 130 compressor unit (roughly, 20,500HP). It then restricted the capacity of the new units through electronic controls such that the delivery capacity remained the same as the original units. GTN explains that it considered smaller-sized replacements (Solar Mars 100), but the smaller units could not meet the same power output as the Avon units in colder temperatures.[22] As relevant here, Commission regulations allow for replacement of physically deteriorated or obsolete facilities if "the replacement will have substantially equivalent designed delivery capacity."[23] The undisputed evidence shows that GTN restricted the horsepower of the

---

[20] In March 2020, GTN submitted notice that it was planning on replacing compressor units at the Athol, Kent, and Starbuck compressor stations. GTN, Filings, Docket Nos. CP20-82-000, CP20-85-000, and CP20-86-000 (all filed March 10, 2020). The replacement units were put into service in October and November 2021. GTN April 18, 2023 Filing at 11. The compressor units that were replaced were originally installed in the early 1970s. GTN April 18, 2023 Filing at 12.

[21] GTN December 16, 2021 Filing at 4-10; GTN April 18, 2023 Filing at 11-13.

[22] GTN April 18, 2023 Filing at 12-13.

[23] 18 C.F.R. 2.55(b)(ii) (2022).

**Exhibit 1**
**Page 6 of 79**

new units to the same horsepower as the old units.[24]  Additionally, GTN provides an adequate explanation for why it selected the Solar Titan units over the Solar Mars units – at cold weather site conditions the smaller Solar Mars units would not have supplied the required compression (i.e., the system design would have failed at colder temperatures).[25] We also note that GTN placed the replacement compressor units in service in 2021, well before receiving authorization for the GTN XPress Project.

17.    As discussed in the rates section below,[26] GTN demonstrates that the illustrative incremental rates for the GTN XPress Project are lower than its existing system rates under Rate Schedule FTS-1.  Accordingly, we find that GTN's proposal to charge its existing applicable system reservation rates as the initial recourse rates for the project will not result in existing customers subsidizing the GTN XPress Project.  However, because this project will involve the removal of the horsepower restrictions on the replacement compressor units, we believe that the parties to a future general section 4 rate proceeding should be able to raise the question of whether some allocation of the compression costs to the GTN Xpress Project is appropriate.  Therefore, as is discussed below, we will not be granting GTN a predetermination of rolled-in rate treatment.  For these reasons, we find that the Certificate Policy Statement's threshold requirement of no subsidization is satisfied.

## 2.    Project Need

18.    GTN has entered long-term precedent agreements with shippers for 100% of the project's capacity.  Precedent agreements for 100% of the project's capacity are significant evidence of the need for the proposed project.

19.    GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest.[27]  The projected end use for this gas is residential, commercial, and industrial users.[28]  It states that Tourmaline is a producer of natural gas that will provide low-cost

---

[24] GTN April 18, 2023 Filing at 9-10.

[25] *Id.* at 12.

[26] *See infra* PP 40-55.

[27] Application at 4.

[28] *Id.* at 9.

**Exhibit 1**
**Page 7 of 79**

natural gas to West Coast markets serving residential, commercial, industrial, and electric generation needs.[29]

| Project Shipper | Transportation demand of Project Capacity (Dth/d) | Primary Term (Years) | Project End Use | Location (by state) of End-Use |
|---|---|---|---|---|
| Cascade | 20,000 | 31 | Residential, Commercial, and Industrial Uses | Oregon and Washington |
| Intermountain | 79,000 | 30 | Residential, Commercial, and Industrial Uses | Idaho |
| Tourmaline | 51,000 | 33 | West Coast Natural Gas Markets | |

20.    All of the shippers state their support of and need for the project.  Cascade states that

> [t]he additional firm capacity provided by the Project will help Cascade continue to meet increasing residential, commercial, and industrial natural gas requirements throughout its system, particularly central Oregon. . . .  GTN is the principle upstream pipeline that transports gas to Cascade's central Oregon distribution system customers. Currently, Cascade's [Integrated Resource Plan] indicates that without the Project Cascade does not have sufficient GTN capacity to serve future load growth in central Oregon.[30]

[29] *Id.* at 4.

[30] Cascade November 8, 2021 Filing at 1; *see also* Cascade January 13, 2023

**Exhibit 1**
**Page 8 of 79**

Intermountain states that the project will "bolster reliable and dispatchable natural gas service in Southern Idaho and will provide GTN's shippers with access to additional supplies and increased liquidity"[31] and that "GTN XPress Project is essential to Intermountain's ability to continue to provide 'firm' natural gas supplies to its customers . . . ."[32]  Tourmaline indicates that the project will allow Tourmaline to "provide reliable and consistent service to downstream customers and provide access to sustainable Canadian gas reserves resulting in long-term gas supply certainty for customers," and to "assuage demand in southern markets when intermittent renewables, such as wind and solar, are not available."[33]

21.     GTN states that "Cascade is faced with peak day supply shortfalls in Oregon, expected as early as 2024, as well as an annual average load growth rate of 2.12% in Zone GTN of Cascade's system."[34]  Citing Intermountain's Integrated Resource Plan, GTN asserts that Intermountain's "residential and commercial customers are forecasted to grow at an annualized rate of 3.3%."[35]  GTN notes that Intermountain is replacing firm transportation capacity that it held on the Northwest Pipeline (Northwest), which supplies natural gas from the Rockies, with capacity on GTN XPress.  GTN asserts that this will create a continuous firm transportation path from the supply source in Alberta, Canada, to Intermountain's service area.  GTN states that the project will help both local distribution companies to meet peak day load with low-cost natural gas, while enhancing supply diversity and mitigating constraints on other transportation options.[36]  As noted above, GTN asserts that natural gas supplies from the Rockies have declined in recent years and the decline is forecast to accelerate in the next 30 years.  GTN states that the GTN XPress Project is necessary, in part, to replace this supply.[37]  GTN describes Tourmaline as Canada's largest natural gas producer and argues that Tourmaline is well-positioned to

Filing at 1 ("Cascade continues to support GTN's application and reiterates its need for the Project.").

[31] Intermountain November 9, 2021 Filing at 1.

[32] GTN April 18, 2023 Filing at attach. B.

[33] Tourmaline November 9, 2021 Filing at 3.

[34] Application at 11.

[35] *Id.* at 12.

[36] *Id.* at 11-12.

[37] *Id.* at 13.

**Exhibit 1**
**Page 9 of 79**

supply West Coast markets and that its capacity commitment is evidence of market need.[38]

22.    The U.S. Environmental Protection Agency (EPA) recommends that the Commission include a description of local and regional energy grids and markets that may be impacted by the GTN XPress Project and recommends that information from the Energy Information Administration's Energy Atlas also be included so that the public can better understand the need for the project.[39] The Energy Atlas can be used to generate a map showing the interstate natural gas pipelines in the Pacific Northwest along with natural gas-fired power plants in the region.[40]

23.    Consistent with EPA's recommendation, we provide further information here. The GTN XPress Project would be within the U.S. Pacific Northwest natural gas and electricity markets.  The following natural gas utilities/local distribution companies operate in the U.S. Pacific Northwest:  Avista Utilities, Cascade, Portland General Electric, , Dominion Energy, Pacific Power, Intermountain, NW Natural, and Puget Sound Energy.[41] Per GTN's application, shipper Cascade serves areas in Washington and Oregon, while shipper Intermountain serves southern Idaho.[42] The U.S. Pacific Northwest is located adjacent to two natural gas producing regions, Western Canada and the Rockies.  Western Canada is the larger source.  Staff analysis of state-level data from the Energy Information Administration shows that the majority of the natural gas consumed in the region comes from Western Canada, primarily through TC Energy's NGTL system and Enbridge's BC Pipeline System.[43] Two interstate pipeline systems

[38] *Id.* at 12-13.

[39] Energy Information Administration, Energy Atlas, Accessed January 5, 2023, https://atlas.eia.gov/.

[40] U.S. Energy Information Administration, *Natural Gas| U.S. Energy Atlas*, https://atlas.eia.gov/apps/3652f0f1860d45beb0fed27dc8a6fc8d/explore (last accessed July 9, 2023).

[41] Northwest Gas Association, *2022 Pacific Northwest Gas Market Outlook*, https://www.nwga.org/_files/ugd/054dfe_207b3155de904ebb8d4513ef2790cfb9.pdf (last accessed July 9, 2023).

[42] Application at 11-12.

[43] U.S. Energy Information Administration, *International and Interstate Movements of Natural Gas by State, Washington, Oregon, and Idaho, Annual, 2018-2021*, https://www.eia.gov/dnav/ng/ng_move_ist_a2dcu_SWA_a.htm.  U.S. Energy Information Administration, *State Profiles and Energy Estimates, Washington and Oregon*, Accessed July 9, 2023, https://www.eia.gov/state/?sid=US.  U.S. Energy

**Exhibit 1**
**Page 10 of 79**

operate in the region: the GTN system and Williams' Northwest Pipeline System. The GTN system is a 1,377-mile pipeline system that transports natural gas from Western Canada to Washington, Oregon, and California with a capacity of 2.7 billion cubic feet per day.[44] The Northwest Pipeline System is a 3,900-mile bi-directional pipeline system that transports natural gas from Western Canada, Rocky Mountain, and San Juan Basin gas supplies to the Western U.S. with a total capacity of 3.8 billion cubic feet per day.[45]

24.     Commenters, including the States of Washington, Oregon, and California, argue that the Commission should consider whether alternative technologies, including renewable alternatives, can better serve consumers' need for energy.[46] We disagree. The Commission's role under the NGA is to decide "whether to adopt an applicant's proposal and, if so, to what degree, not to engage in resource planning for energy end-users."[47] Here, the project's purpose is to serve the firm natural gas transportation requirements of its shippers due to increased demand, provide access to lower-cost gas, enhance reliability, and increase supply diversity.[48] The record does not establish that energy efficiency or other non-gas alternatives would satisfy the needs expressed by the project shippers in this proceeding.

25.     Commenters, including the States of Washington, Oregon, and California, also argue that the project capacity is not needed because state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas.[49] Some

Information Administration, *Natural Gas Consumption by End Use, Washington, Oregon, and Idaho, Annual, 2018-2021,* https://www.eia.gov/dnav/ng/ng_cons_sum_dcu_SWA_a.htm.

     [44] TC Energy, *TC Energy-Gas Transmission Northwest*, https://www.tcenergy.com/operations/natural-gas/gas-transmission-northwest/ (last accessed July 9, 2023).

     [45] Williams, *Northwest Pipeline*, https://www.williams.com/pipeline/northwest-pipeline/ (last accessed July 9, 2023).

     [46] *See, e.g.*, Washington, Oregon, & California August 22, 2022 Protest at 28; Rogue Climate June 8, 2023 Comment at Ex. A & B.

     [47] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148, at P 82 (2023) (internal quotation and citation omitted).

     [48] Application at 3-4.

     [49] *See, e.g.*, Washington, Oregon, & California August 22, 2022 Protest at 15-19; Oregon Citizens' Utility Board January 27, 2023 Comment at 3 ("Until Cascade completes a new Integrated Resource Plan that reflects the impact of Oregon carbon

**Exhibit 1**
**Page 11 of 79**

commenters further assert that the precedent agreements with Cascade, Intermountain, or Tourmaline do not demonstrate that the project is needed for various reasons, as discussed further below, including because state climate legislation will reduce demand.[50] In contrast, commenters supporting the project, including the State of Idaho,[51] argue that the project is needed to meet growing demand, increase supply diversity, provide low-cost and reliable natural gas, and provide economic benefits.  Idaho argues that the 30-year precedent agreements for the project's entire capacity demonstrate need.[52]  It notes that Intermountain serves more than 400,000 customers in 74 communities in Idaho.  It argues that basing "infrastructure determinations off of arbitrary 'clean energy standards' adopted by Idaho's neighboring states" directly conflicts with Commission precedent, Supreme Court precedent, and the Natural Gas Act, and that "[a]ttempts to use the NGA to impose individual state policy preferences on other states would be misguided and clearly conflict with observable, real-life need for additional pipeline capacity."[53]

regulation, and federal electrification policies, growth-related investments, including this pipeline expansion, should be avoided."); Rogue Climate June 8, 2023 Comment at 1 & Ex. A.

[50] Washington, Oregon, & California August 22, 2022 Protest at 19-23; Rogue Climate June 8, Comment at 1 ("The precedent agreements and the market/need evidence submitted by GTN are insufficiently probative of project need. . . ."). Rogue Climate appears to make the argument that the Cascade and Intermountain precedent agreements are not reliable indicators of need because both entities are subsidiaries of MDU Resources. Rogue June 8, 2023 Comment at 1 & Ex. A. We note that an affiliation between shippers does not raise the same concerns as an affiliation between a pipeline company and a shipper.  A core reason for looking behind an affiliate precedent agreement between a pipeline company and a shipper is to assure that the proposed project will not impose excessive costs on the affiliate and its captive ratepayers.  *See Spire STL Pipeline LLC,* 181 FERC ¶ 61,232, at P 37, at n.104 (2022) (*citing Envtl. Def. Fund v. FERC,* 2 F.4th 953, 973 (D.C. Cir 2021) & *Chinook Power Transmission, LLC,* 126 FERC ¶ 61,134 (2009)).  That concern is not implicated in affiliations between shippers.

[51] Idaho Governor's Office of Energy & Mineral Resources February 22, 2022 Comment; State of Idaho October 24, 2022 Comment (The was a letter signed by Idaho's Governor, Brad Little, and its entire U.S. Congressional delegation, Senators James Risch and Mike Crapo and Congressmen Mike Simpson and Russ Fulcher); Senator James Risch June 12, 2023 Comment.

[52] State of Idaho October 24, 2022 Comment at 1-2.

[53] *Id.* at 2.

**Exhibit 1**
**Page 12 of 79**

26.      As discussed below, in considering the record, the Commission finds that the existence of binding precedent agreements for 100% of the project capacity is significant evidence of need.  Moreover, we note that the project will likely decrease costs to consumers and increase supply diversity.  And as the Commission has explained, state policies do not, by themselves, limit the Commission's authority to find that a project is required by the public convenience and necessity.[54]

Cascade Precedent Agreement

27.      Washington, Oregon, and California and others argue that the Cascade precedent agreement does not demonstrate need because Cascade's future demand projections, as stated in its 2020 Integrated Resource Plan (IRP), do not take into account legislation intended to reduce GHG emissions.[55]  They assert that these legislative efforts will result in decreased demand for natural gas.  GTN disputes the assertion that state energy policies undermine the demonstration of need through precedent agreements.[56]  It argues that the effect of this legislation on natural gas demand is speculative and should not dissuade the Commission from adhering to its well-established precedent and policy of relying on precedent agreements as the soundest evidence of market support.[57]  To support this position, it provides data showing that throughput on the GTN system has increased steadily over the last decade, including over the past few years, when the climate legislation has been in place.[58]  We find, as we have in other proceedings, that the existence of state legislation intended to reduce GHGs does not undercut our finding that need is demonstrated by the precedent agreements.  This approach is consistent with the Commission's recent orders.[59]  In some of those recent orders, the Commission rejected

----

[54] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 26.

[55] Washington, Oregon, & California August 22, 2022 Joint Intervention & Protest at 19-20; *see also* Rogue Climate June 8, 2023 Filings at Ex. A (arguing that Cascade has not adequately accounted for Washington climate legislation in its demand estimates.); Columbia Riverkeeper March 8, 2023 Comment.

[56] GTN April 18, 2023 Filing at 3-4.

[57] *Id.* at 4.

[58] *Id.* at 4-5.

[59] *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 70 (collecting examples of cases addressing this) (citing *Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234, at PP 14-15 (2022); *Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041, at P 17, *order on reh'g*, 181 FERC ¶ 61,051, at PP 15-17 (2022); *Iroquois Gas Transmission Sys.*, 178 FERC ¶ 61,200, at P 15 (2022)).

**Exhibit 1**
**Page 13 of 79**

the argument that it was unnecessary to authorize natural gas infrastructure that would add additional capacity because New York enacted climate legislation that establishes statewide greenhouse gas (GHG) emissions reduction targets over time.[60]  The Commission explained that the New York climate legislation did not undermine the findings of project need, which were based on precedent agreements for 100% of the project capacity.[61]  The same applies here.[62]  Washington, Oregon, and California have not submitted evidence that their climate legislation has actually resulted in reduced demand for natural gas.  Moreover, more than 50% of the project capacity is subscribed by Intermountain, a local distribution company serving customers in Idaho and not in Washington, Oregon, or California.

28.      Washington, Oregon, and California also argue that, even accepting Cascade's IRP projections, Cascade will not need the capacity on the GTN XPress Project until well past 2040.[63]  We disagree.  First, as Cascade clarified in its comments, because Cascade signed its precedent agreement in 2019, the GTN Xpress Project capacity was included as part of the capacity available to Cascade in the 2020 IRP which Cascade previously submitted to Washington and Oregon.[64]  Moreover, the States' own analysis shows that a theoretical peak day in Cascade's GTN service area will likely need some of the project's additional capacity much sooner than 2040.[65]  Cascade states that it is contracting for

----

[60] *Id*. (citing *Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041 at P 17, *order on reh'g*, 181 FERC ¶ 61,051 at PP 15-17; *Iroquois Gas Transmission Sys.*, 178 FERC ¶ 61,200 at P 15).

[61] *Id*. (citing *Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234 at P 15 (stating that the climate change legislative enactments and prohibition on the state's issuance of site certificates for Oregon-based fossil fuel electric generation facilities do not undercut the Commission's need determination); *Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041 at P 17, *order on reh'g*, 181 FERC ¶ 61,051 at P 16; *Iroquois Gas Transmission Sys.*, 178 FERC ¶ 61,200 at P 15).

[62] In addition to GHG emission reduction targets, Washington has enacted a building code requiring most new residential homes, commercial buildings, and multifamily structures to be built with heat pumps.  We do not think that a single state limiting new gas hook ups materially changes the finding of need where the ban, has exceptions, exists in only one of several states being served by the project, and where there is no showing of the extent to which the measure will reduce demand.

[63] Washington, Oregon, & California August 22, 2023 Protest at 20.

[64] GTN April 18, 2023 Filing, attach. A.

[65] *See* Washington, Oregon, and California August 22, 2022 Protest Ex. B at 19 ("Then, assuming Cascade's Peak Day in 2023 equals this 42,223 Dth per day capacity,

**Exhibit 1**
**Page 14 of 79**

20,000 dth/d because it has estimated that it will need the additional capacity incrementally between now and 2040.  Local distribution companies often base their contracted capacity on anticipated needs to satisfy peak demand.  We will not second guess Cascade's decision to contract for the full amount of capacity that it anticipates it will need, and to do so now, when the capacity is being offered at certain terms and conditions, including price, rather than Cascade contracting for a smaller amount now with uncertainty about its ability to contract under similar terms at a later date to satisfy demand.[66]

Intermountain Precedent Agreement

29.     Washington, Oregon, and California argue that the precedent agreement with Intermountain, which serves customers in Idaho, does not support a finding of need because the capacity on GTN would be replacing capacity on Northwest.[67]  They cite the Commission's Certificate Policy Statement for the proposition that projects designed "to serve markets already served by another pipeline" require a greater showing of public need and benefits.[68]  The States also object to Intermountain's agreement to pay for service from Kingsgate to Malin, but only use service to Stanfield, and allege that this agreement may not conform with GTN's tariff.[69]

and assuming the 2.12% average annual load growth from 42,223 Dth per day, Page 2 Exhibit GML-3 shows that even extending 2.12% annual growth to 2040, the 2040 Peak day is 60,316 Dth per day, an increase of approximately 18,000 Dth per day over the 17-year period from 2023 to 2040.  This compares to the 20,000 Dth per day subscription level of Cascade to the GTNX Project.  In other words, Cascade does not project needing the full 20,000 Dth/d it contracted for in the next 17 years.").

[66] We note that the Commission's findings under the NGA regarding whether the project is required by the public convenience and necessity do not preclude state regulators from undertaking an after-the-fact prudency review of any purchase agreement by an LDC, consistent with the state's jurisdiction.  The Commission has held that oversight of the procurement decisions of LDCs is best left to state regulators.  *See Transcontinental Gas Pipe Line Co. LLC*, 182 FERC ¶ 61,148, at P 28 (2023).

[67] Washington, Oregon, & California August 22, 2022 Protest Ex. B at 23.

[68] Certificate Policy Statement, 88 FERC ¶ 61,227 at 25.

[69] Washington, Oregon, & California May 5, 2023 Comment at 5.

**Exhibit 1**
**Page 15 of 79**

30.     GTN and Intermountain respond that the GTN XPress Project is not competing with capacity on Northwest.[70]  They note that Northwest is the only interstate pipeline providing Intermountain with service directly into Southern Idaho.  They state that Northwest informed Intermountain that 59,000 MMbtu per day of service it held on Northwest in the Rocky Mountain region under release of long-term temporary segmented capacity from other third parties would no longer be available past the current expiration date.  To replace the expiring capacity, Northwest offered, and Intermountain accepted, a contract for firm primary path capacity on Northwest with a receipt point at the Stanfield, Oregon, interconnect with GTN instead of the receipt points in the Rocky Mountain region.  GTN and Intermountain state that the receipt point at Stanfield will still allow for delivery into Southern Idaho on Northwest.  However, Intermountain does not currently have the same amount of firm capacity on GTN delivering to the Stanfield interconnect as it has on Northwest taking gas from that point.  They further note that even prior to this latest agreement with Northwest, Intermountain's firm capacity on GTN delivering to Stanfield was less than its capacity from that point and it was already relying at times on either secondary firm capacity on GTN or direct purchase of gas supplies delivered from other suppliers at Stanfield to provide ultimate delivery on Northwest to Southern Idaho.  Therefore, Intermountain signed a precedent agreement with GTN to secure 79,000 Dth/d of firm service, or more than half of the proposed expansion capacity.[71]

31.     The Certificate Policy Statement states that "projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline."[72]  That statement does not mean that precedent agreements for projects to serve markets already served by another pipeline are not significant evidence of need.  The Certificate Policy Statement goes on to say that "contracts or precedent agreements always will be important evidence of demand for a project."[73]  And the NGA states that "[n]othing contained in [NGA section 7] shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company."[74]

---

[70] GTN April 18, 2023 Filing at 7 & attach. B.

[71] *Id.*

[72] Certificate Policy Statement, 88 FERC ¶ 61,227 at 61,748.

[73] *Id.*

[74] 15 U.S.C. § 717f(g).

**Exhibit 1**
**Page 16 of 79**

32.    In any event, GTN is not competing with Northwest to serve markets in Southern Idaho.  Rather, Intermountain is changing its receipt point for natural gas service on Northwest from the Rocky Mountain region to Stanfield, Oregon.  Delivery to Intermountain's distribution system in Southern Idaho will still be on Northwest.  Regarding conformity with GTN's tariff, the States have not identified any specific tariff provision that GTN's agreement with Intermountain would not conform with here.  We find that that the precedent agreement with Intermountain, for more than 50% of project capacity, is significant evidence of need.

Tourmaline Precedent agreement

33.    Washington, Oregon, and California argue that the precedent agreement with Tourmaline is not evidence of need because Tourmaline is a gas producer and not a consumer.[75]  Further, they dispute Tourmaline's ability to sell the gas to West Coast markets because they assert that there is enough gas currently available to satisfy demand.[76]

34.    GTN disagrees with these assertions and provides data from Tourmaline showing that demand for natural gas in the West has remained stable over the last decade despite significant growth in renewable generation.[77]  It also provides data showing natural gas production in the Rockies has been declining over the same period and production in Canada has been increasing in order to offset the decline in Rockies production and meet demand.[78]

35.    Precedent agreements, including agreements with natural gas producers, are significant evidence of need.[79]  None of the arguments from Washington, Oregon, and

[75] Washington, Oregon, & California August 22, 2022 Protest at 22-23.

[76] Id.

[77] GTN April 18, 2023 Filing at attach. C.

[78] Id. at attach. D.

[79] See Equitrans, L.P., 183 FERC ¶ 61,200, at PP 15-16 (2023) (finding that precedent agreements with natural gas producers are significant evidence of need); see also NEXUS Gas Transmission, LLC, 172 FERC ¶ 61,199, at P 17 (2020) ("We find transportation service for all shippers as providing public benefits, and do not weigh different prospective end uses differently for the purpose of determining need.").  The Commission has also previously found precedent agreements with Tourmaline evidence of need.  ANR Pipeline Co., 179 FERC ¶ 61,040, at P 71 (2022) ("The proposed project will enable ANR to provide up to 165,000 Dth/d of firm transportation service, 100% of

**Exhibit 1**
**Page 17 of 79**

California convince us to the contrary.  We note that any risk of declining market demand is borne by Tourmaline itself as a producer and marketer, and not by any captive ratepayer.

Project Need Conclusions

36.    Precedent agreements for 100% of a project's capacity are significant evidence of the need for the project.  Moreover, we find that the project's incremental firm deliverability will provide shippers with additional flexibility to transport natural gas produced in Western Canada to meet demand in markets in the Northwest and West Coast regions.  We also find that the project will provide a tangible benefit to consumers through added reliability and by providing access to lower-cost gas at the Kingsgate Hub (Canada), where prices have historically been substantially lower than at the Rockies hubs serving these markets.

### 3.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

37.    As discussed above, we find that GTN's existing shippers will not subsidize the proposed project.  Further, the proposed project will have no adverse effect on GTN's existing customers because the proposed expansion facilities are designed to provide incremental service to meet the needs of the project shippers without degradation of service to GTN's existing customers.  We also find that there will be no adverse impact on other pipelines in the region or their captive customers.  The project shippers will use the project's capacity to serve the incremental growth requirements of their markets.  The project will not affect or displace existing service on other pipelines and no pipelines or their captive customers have objected to GTN's proposal.

38.    We are further satisfied that GTN has taken steps sufficient to minimize adverse impacts on landowners and surrounding communities.  The proposed facility modifications and additions will be located entirely on property owned by GTN, within a GTN easement, or on temporarily leased space.[80]  The total acreage to be disturbed for construction of the project facilities is 46.9 acres, of which only 1.2 would be permanently affected.[81]  No physical work or ground disturbance would occur at the Athol Compressor Station.  At the Starbuck Compressor Station, the proposed facilities would be located within the fenced boundaries of the site.  At the Kent Compressor

the project's capacity, to Tourmaline and TVA, which we find sufficient to demonstrate a need for the project.").

[80] Application at 7.

[81] November 18, 2022 Final EIS at 2-2.

Exhibit 1
Page 18 of 79

Station, the proposed facilities would be located in an expanded and fenced area abutting the existing site. The nearest residence to either the Starbuck or Kent Compressor Stations is about 0.5 mile away. Therefore, we are satisfied that GTN has taken appropriate steps to minimize adverse impacts on any landowners and communities affected by the project.

### 4. **Certificate Policy Statement Conclusion**

39.     The proposed project will enable GTN to provide 150,000 Dth/d of incremental firm transportation service. The project is fully subscribed, will provide access to lower-cost gas, and will enhance supply diversification and reliability. Accordingly, we find that GTN has demonstrated a need for the project. Further, the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers and will have minimal economic impacts on the interests of landowners and surrounding communities. Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[82]

### B.    **Rates**

40.     GTN proposes to use its mileage-based existing system recourse reservation charge of $0.250323 per Dth and a system usage charge of $0.009799 per Dth under Rate Schedule FTS-1 as the initial maximum recourse charges for transportation service.[83] GTN estimates a first-year cost of service of $10,628,781 for the GTN XPress Project.[84] The estimated cost of service incorporates GTN's last Commission-approved depreciation rates of 1.80% for mainline transmission plant, 3.50% for the gas turbine

---

[82] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[83] GTN's reservation charge consists of two components: a non-mileage reservation charge of $0.028612 per Dth and a mileage reservation charge of $0.000362 per Dth. The mileage reservation charge of $0.000362 per Dth is multiplied by the project's delivery path mileage of 612.46 for a product of $0.221711 per Dth. The two components of $0.028612 per Dth and $0.221711 per Dth are then added together for a system reservation charge of $0.250323 per Dth. *See* GTN May 20, 2022 Data Request Response, attach. 1, lines 11-16.

[84] *Id.* at 4. On November 18, 2021, the Commission approved GTN's uncontested settlement, which included the same depreciation and negative salvage rates from its Docket No. RP15-904-000 settlement. *See Gas Transmission Nw. LLC*, 177 FERC ¶ 61,110 (2021).

**Exhibit 1**
**Page 19 of 79**

unit, and 0.05% for the negative salvage rate as established in Docket No. RP15-904-000.[85]  GTN states that the rate of return for the project is based upon GTN's last approved after-tax rate of return of 9.66% as established in Docket No. RP94-149-000.[86]

41.     The Commission has generally held that the applicable system recourse rate is appropriate for a project if the estimated cost-based rate is less than the current system rate.  Otherwise, the pipeline is required to establish an incremental rate to ensure that there is no subsidization from existing shippers.[87]  GTN has calculated illustrative incremental reservation and usage charges based on GTN's first-year cost of service and monthly stated billing determinants.[88]  The calculated illustrative incremental reservation charge of $0.191206 per Dth and the illustrative incremental usage charge of $0.003675 per Dth for the project are lower than the currently effective system recourse Rate Schedule FTS-1 charges.[89]

42.     We have reviewed GTN's proposed cost of service and initial rates and find that they are consistent with Commission policy.  Because the rate analysis demonstrates that the maximum Rate Schedule FTS-1 system recourse reservation and usage charges are greater than the illustrative incremental reservation and usage charges, respectively, we approve GTN's request to use its existing system charges under Rate Schedule FTS-1 as the initial recourse charges for the Project.  In addition, GTN is directed to charge the applicable system interruptible rate for the Project.

### 1.     **Fuel**

43.     GTN proposes to apply its system-wide effective fuel and line loss percentage to recover the costs of fuel and line loss for the project.  GTN states that the current fuel and

---

[85] *See Gas Transmission Nw. LLC*, 177 FERC ¶ 61,110.  The States of Washington, Oregon, and California argue that a modified depreciation rate should be used for the project.  Washington, Oregon, and California August 22, 2022 Protest at 17 and at Ex. C at 27-28.  The Commission's general policy with respect to pipeline expansions is to use the depreciation rate approved in the pipeline's last NGA section 4 general rate proceeding as GTN has done here.  *See Gulf S. Pipeline Co., LP*, 163 FERC ¶ 61,124, at P 23 (2018), *reh'g denied*, 166 FERC ¶ 61,089, at P 30 (2019); *Wyo. Interstate Co.*, 119 FERC ¶ 61,251, at P 22 (2007).

[86] Application at n. 19.

[87] Certificate Policy Statement, 88 FERC at 61,746.

[88] GTN May 20, 2022 Data Request Response, attach. 1.

[89] *Id.* at lines 11-14.

**Exhibit 1**
**Page 20 of 79**

line loss percentage for project shippers will be adjusted on a monthly basis in accordance with its tariff. As set forth in Exhibit Z-3, GTN detailed the impact of including the project's incremental throughput and estimated fuel requirements into the total system throughput and actual fuel usage from 2020. GTN states that including the project results in a reduced 2020 average effective fuel and line loss percentage. GTN evaluated the potential effect of the project on the overall system fuel consumption and determined that existing shippers will not subsidize the fuel costs attributable to the project.[90] We have reviewed this information and agree. Therefore, we approve GTN's proposal to apply its system-wide effective fuel and line loss percentage to the project.

## 2.      Predetermination of Rolled-in Rates

44.      GTN requests a predetermination of rolled-in rate treatment for costs associated with the project. In support of its request, GTN asserts that the project will result in incremental revenues exceeding incremental costs.

45.      On November 9, 2021, PG&E protested GTN's request for a predetermination of rolled-in rates.[91] PG&E argues that GTN failed to provide sufficient information on how the proposed project interrelates to other work GTN has indicated it intends to construct. PG&E requests that the Commission defer any decision on the appropriateness of rolled-in rate treatment until GTN's next general NGA section 4 rate case, given the lack of information about the impact of the Project as a whole on existing shippers. PG&E also requests that the Commission convene a technical conference.[92]

46.      On November 17, 2021, PSE also protested GTN's request for a predetermination of rolled-in rate treatment. PSE is not opposed to the GTN XPress Project but argues, similarly to PG&E, the merits of GTN's request for rolled-in rate treatment should be determined in GTN's next general NGA section 4 rate case, after additional information is provided to the Commission. Specifically, PSE notes that GTN has stated its proposal will add approximately $75.1 million in costs to ratepayers, and that the Commission should investigate whether the cost of the excess capacity, approximately $251 million, created by the compressor facilities that were constructed in the prior notice proceedings in Docket Nos. CP20-82-000, CP20-85-000, and CP20-86-000, should be included in the cost of the project.[93]

---

[90] Application at 15 & Ex. Z-3.

[91] PG&E November 9, 2021 Comments at 3-4.

[92] *Id.* at 4.

[93] PSE November 17, 2021 Comments at 4-6.

**Exhibit 1**
**Page 21 of 79**

47.    On December 16, 2021, GTN filed an answer to the PG&E and PSE protests (GTN Answer).  GTN states that the PG&E and PSE protests are without merit and should be dismissed.  GTN states that it demonstrated that the estimated revenues associated with the project will exceed the estimated cost of service associated with the project facilities,[94] which satisfies the Commission's standard for such a predetermination.

48.    GTN avers that allocating the costs of the prior reliability work to the project would be directly contrary to Commission policy and would likely cause a huge windfall to base system shippers, resulting in project shippers improperly subsidizing reliability work from which base system shippers benefit.  GTN states that the prior reliability work was not intended to create incremental capacity and that those projects are already in service and thus, all costs associated with the section 2.55(b) replacement projects have been excluded from the predetermination analysis.[95]

49.    On December 28, 2021, PSE filed an answer to GTN's Answer (PSE Answer).  PSE renews its request that the Commission disallow a presumption of rolled-in rate treatment for the project to protect existing shippers.  Further, PSE states that the Commission should require GTN, in its next general NGA section 4 rate case proceeding, to separately account for the construction, operating costs, and revenues from in-kind-sized replacement compressors prior notice procedures, the uprated portion of the compressors, and other expansion facilities to ensure that costs are properly allocated between the prior reliability work and the GTN Xpress Project.[96]

50.    On August 22, 2022, the States of Washington, Oregon, and California filed a protest arguing, in part, that the cost of the reliability work performed under section 2.55 should be included in the cost of the project.

51.    On September 6, 2022, GTN provided an answer to the States' protest, noting its previous explanation that costs were properly allocated.

Discussion

52.    To receive a predetermination favoring rolled-in rate treatment, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion.  In general, this means that a pipeline must show that the revenues to be generated by an expansion

[94] Application Ex. N, at 1.

[95] GTN Answer at 7-10.

[96] PSE Answer at 6-7.

**Exhibit 1**
**Page 22 of 79**

project will exceed the project costs. To make this determination, we compare the project cost to the revenues generated using actual contract volumes and either the maximum recourse rate or, if the negotiated rate is lower than the recourse rate, the actual negotiated rate.[97]

53.     As noted above, costs associated with the previous reliability work were properly excluded in the application for the GTN XPress Project.[98] However, it appears that a portion of the horsepower from the replacement compressors, which was not necessary or used to replicate the service provided by the old compressors that they were installed to replace, will be activated and used to provide expansion project service. Commission policy is that costs associated with existing capacity that is used for an incremental project should not be included in the incremental project's cost of service for purposes of establishing initial rates since these costs are already in rate base and the initial incremental recourse rates should be designed to reflect only the incremental costs associated with the project.[99] However, while the costs of the replacement compressors appear to be in existing rates,[100] there is a question as to whether the portion of the horsepower being used to support the expansion project is currently in use. We believe that parties should be free to argue in the next rate case that a portion of the compression costs should be assigned to the expansion project. Therefore, in order to fully preserve the ability of the parties to address the allocation issue in a future general NGA section 4 rate case, we will not, in this certificate order, grant a predetermination favoring rolled-in rate treatment in such a proceeding.

### 3.     Reporting Incremental Costs

54.     We require GTN to keep separate books and accounting of costs and revenues attributable to the capacity created by the project in the same manner as required by section 154.309 of the Commission's regulations.[101] The books should be maintained with applicable cross-reference and the information must be in sufficient detail so that the

---

[97] *Tenn. Gas Pipeline Co., L.L.C.*, 144 FERC ¶ 61,219, at P 22 (2013).

[98] *See supra* P 17.

[99] *See Tex. E. Transmission, LP*, 165 FERC ¶ 61,132, at P 19 (2018).

[100] GTN's existing rates are the result of a "black box" settlement. *Gas Transmission Nw. L.L.C.*, 177 FERC ¶ 61,110.

[101] 18 C.F.R. § 154.309 (2022). *See Gulf S. Pipeline Co., LLC*, 173 FERC ¶ 61,049, at P 6 (2020) (for projects that use existing system rates for the initial rates, the Commission's requirement for separate books and accounting applies only to internal books and records).

**Exhibit 1**
**Page 23 of 79**

data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[102]

### 4.    Negotiated Rates

55.    GTN proposes to provide service on the project to the project shippers under negotiated rate transportation agreements.  GTN must file either its negotiated rate agreements or a tariff record setting forth the essential elements of the agreements in accordance with the Commission's Alternative Rate Policy Statement[103] and the Commission's negotiated rate policies.[104]

### C.    Environmental Impacts

56.    On January 21, 2022, the Commission issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed GTN XPress Project, Request for Comments on Environmental Issues, and Schedule for Environmental Review*.  The notice was published in the *Federal Register*[105] and was mailed to affected landowners (as defined in the Commission's regulations); federal, state, and local officials; Indian tribes; agency representatives; environmental and public interest groups; and local libraries and newspapers.  In response to the notice, the Commission received comment letters from

---

[102] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines,* Order No. 710, FERC Stats. & Regs. ¶ 31,267, at P 23 (2008).  In *Gulf South*, the Commission clarified that a pipeline charging its existing system rates for a project is not required to provide books and accounting consistent with Order No. 710.  However, a pipeline is required to maintain its internal books and accounting such that it would have the ability to include this information in a future FERC Form No. 2 if the rate treatment for the project is changed in a future rate proceeding.

[103] *Alts. to Traditional Cost-of-Serv. Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transportation Servs. of Nat. Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194, *order on reh'g and clarification*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066, *reh'g dismissed*, 75 FERC ¶ 61,291 (1996), *petition denied sub nom. Burlington Res. Oil & Gas Co. v.* FERC, 172 F.3d 918 (D.C. Cir. 1998) (Alternative Rate Policy Statement).

[104] *Nat. Gas Pipeline Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[105] 87 Fed. Reg. 4578 (Jan. 28, 2022).

**Exhibit 1**
**Page 24 of 79**

the National Park Service, the EPA, Columbia Riverkeeper, Rogue Climate, the Idaho Governor's Office, and Sierra Club. The comments concerned Environmental Impact Statement (EIS) preparation, geology and soils, water resources, threatened and endangered species, environmental justice, land use, cultural resources, air quality and noise, climate change, reliability and safety, and alternatives.

57.    To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[106] Commission staff prepared a draft EIS, which was issued on June 30, 2022, with EPA participating as a cooperating agency. The draft EIS addressed all substantive environmental comments received prior to issuance. The draft EIS was filed with the EPA, and the Commission issued a Notice of Availability (NOA) of the draft EIS on June 30, 2022. The draft EIS was noticed in the *Federal Register*[107] on July 7, 2022, establishing a 45-day comment period that ended on August 22, 2022. The NOA was also mailed to project stakeholders. In response to the draft EIS, the Commission received comments from the EPA; the States of Washington, Oregon, and California; various non-governmental organizations including the Crag Law Center, Rogue Climate, Wild Idaho Rising Tide, Earth Ministry, Columbia Riverkeeper, Oregon Physicians for Social Responsibility, Washington Physicians for Social Responsibility, 350 Eugene, 350 Deschutes, 350 PDX, 350 Seattle, Rogue Climate, Oregon Just Transition Alliance, Southern Oregon Climate Action Now, Ministry/Washington Interfaith Power and Light, Red Earth Descendants, Oregon Women's Land Trust, Breach Collective, Southern Oregon Pachamama Alliance, Siskiyou Rising Tide, Climate Solutions, Beyond Toxics, and Columbia River Inter-Tribal Fish Commission; the Pipelines Local 798; and 8 individuals. The comments expressed concerns for environmental justice communities, sensitive species, climate change and GHG emissions, the purpose and need for the project, and cumulative impacts in the project area.

58.    Commission staff issued the final EIS for the project on November 18, 2022, and a NOA was published in the *Federal Register* on November 25, 2022.[108] The final EIS addresses geology; soils; groundwater; surface water; wetlands; fisheries and aquatic resources; vegetation and wildlife (including threatened, endangered, and other special-status species); land use and visual resources; cultural resources; socioeconomics (including environmental justice[109]); air quality and noise; GHG and climate change;

---

[106] 42 U.S.C. §§ 4321 *et seq. See also* 18 C.F.R. pt. 380 (2022) (Commission's regulations implementing NEPA).

[107] 87 Fed. Reg. 40,516 (July 7, 2022).

[108] 87 Fed. Reg. 72,472 (Nov. 25, 2022).

[109] Under NEPA, the Commission considers impacts to all potentially affected communities. Consistent with Executive Order 12898 and Executive Order 14008, the

Exhibit 1
Page 25 of 79

reliability and safety; cumulative impacts; and alternatives.  It addresses all substantive environmental comments received on the draft EIS and concludes that most adverse environmental impacts resulting from the proposed project would be temporary or short-term during construction.  Permanent impacts resulting from the proposed project are primarily limited to the expanded aboveground facilities at the Starbuck Compressor Station.  The final EIS concludes that impacts would be reduced to less than significant levels through implementation of GTN's proposed avoidance, minimization, and mitigation measures and Commission staff's recommendations, which we have adopted, with a modification discussed below, herein as environmental conditions in the appendix to this order.[110]

59.     In response to the final EIS, the Commission received comments from the EPA, States of Washington, California, and Oregon, non-governmental organizations, and individuals.  Many of these comments express concerns regarding safety, environmental justice, sensitive species, climate change and GHG emissions, the public health and safety risks of increasing reliance on natural gas, cultural resources, and the purpose and need for the project.  The project shippers, Oregon State Building and Construction Trades Council, the State of Idaho, United States Senators, the MDU Utilities Group, and other individuals filed comments in support of the project.  The comments on the final EIS were generally consistent with those received in either scoping or on the draft EIS and were sufficiently addressed within the final EIS.  We do, however, address some of these comments below.  In addition, GTN also filed comments on the final EIS, including on recommended environmental condition 7, which is discussed below.

60.     After Commission staff issued the final EIS, Congress enacted the *Fiscal Responsibility Act of 2023*.[111]  A section titled "Builder Act" amended NEPA in several

Commission separately identifies and addresses "disproportionately high and adverse human health or environmental effects" on environmental justice communities. Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994); Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  *See infra* PP 73-91.

[110] Final EIS at 5-1.

[111] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10 (June 3, 2023).  The Commission relied on the *Fiscal Responsibility Act of 2023* in a recent order.  *See Mountain Valley Pipeline, LLC*, 183 FERC ¶ 61,221, at PP 7, 9, 11 n.20 (2023).

**Exhibit 1**
**Page 26 of 79**

ways.[112]  NEPA section 102(C), as amended, requires that agencies prepare NEPA documents on:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.[113]

The Commission has complied with its NEPA responsibilities under both versions of the statute.[114]

## 1.     Environmental Condition 7

61.     GTN requests that the Commission revise recommended environmental condition 7 to require GTN to employ at least one environmental inspector for the project

---

[112] *See* FISCAL RESPONSIBILITY ACT OF 2023, PL 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act").

[113] 42 U.S.C. § 4332(c)(i).

[114] We note that the Council on Environmental Quality recently published a Notice of Proposed Rulemaking to revise its regulations implementing NEPA, including to implement the Builder Act amendments.  88 Fed. Reg. 49,924 (July 31, 2023).  The Commission will monitor this proceeding to inform the Commission's practices going forward.

**Exhibit 1**
**Page 27 of 79**

and not one at each compressor station where physical ground disturbance would occur. We note that this recommended condition was inadvertently changed between the draft EIS and final EIS and agree with the requested revision. Accordingly, environmental condition 7 as adopted in the appendix to this order is revised to state that GTN is required to employ at least one environmental inspector for the project, consistent with the recommendation in the draft EIS.

## 2.    Project Safety

62.    Several comments discuss safety concerns, including the safety of increasing compression and pressure within the existing pipeline system. As stated in section 4.11 of the final EIS, the Department of Transportation's (DOT) Pipeline and Hazardous Materials Safety Administration administers the national regulatory program to ensure the safe transportation of natural gas and other hazardous materials by pipeline. DOT prescribes the minimum standards for operating and maintaining pipeline and aboveground natural gas facilities, including the requirement to establish a written plan governing these activities.[115] The project facilities would be designed, constructed, operated, and maintained in accordance with the DOT Minimum Federal Safety Standards in 49 C.F.R. 192 (2022). GTN operates its existing facilities, including its pipeline, in compliance with these standards and requirements.[116] In addition, GTN's Emergency Response Plan, which is reviewed yearly with the local fire departments, includes measures to address wildfires.[117]

## 3.    Greenhouse Gas Emissions and Climate Change

63.    The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[118] An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[119]

---

[115] Final EIS at 4-55.

[116] *Id*. at 4-54.

[117] *Id*. at 4-56.

[118] 40 C.F.R. § 1508.1(g) (2022).

[119] *Id*. § 1508.1(aa). *See generally Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (explaining that "NEPA requires 'a reasonably close causal relationship'"

**Exhibit 1**
**Page 28 of 79**

64.     For the GTN XPress Project, we find that the construction emissions, operational emissions, and downstream combustion emissions associated with the capacity subscribed by Cascade and Intermountain (together, 99,000 Dth/d) are reasonably foreseeable.[120]  Construction activities are estimated to result in emissions of 6,941 metric tons of carbon dioxide equivalents ($CO_2e$).  In subsequent years, project operations are estimated to result in emissions of 129,932 metric tons of $CO_2e$ per year.[121]  Reasonably foreseeable downstream emissions, could result in emissions of 1.9 million metric tons of $CO_2e$ per year, assuming that the natural gas would be completely combusted.[122]  The Final EIS estimates that the social cost of GHGs from the project is either $739,364,852

between the environmental effect and the alleged cause" and that "[t]he Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law'") (citation omitted); *Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[120] In their comments on the final EIS, the States of Washington, Oregon, and California argue that the final EIS does not adequately explain why the emissions associated with the capacity subscribed by Tourmaline are not considered reasonably foreseeable, as they were in the draft EIS.  Tourmaline is a natural gas producer and the end use for the natural gas which will be transported using its subscribed capacity is not known.  Tourmaline has stated the gas is generally intended for West Coast markets.  Therefore, the downstream emissions associated with the capacity are not reasonably foreseeable.  *See ANR Pipeline Co.*, 179 FERC 61,040, at PP 13, 45 (2022) (excluding from the calculation of reasonably foreseeable downstream emissions the emissions associated with capacity that would "supply . . . other U.S. markets" along the pipeline system).

[121] GTN pointed out in comments on the final EIS that the operational emissions included in the final EIS were incorrect.  The final EIS estimated operational emissions to be 393,065 metric tons of $CO_2e$ per year, but this represented the full amount of emissions from the Athol, Starbuck, and Kent Compressor Stations once all proposed modifications are completed.  The incremental increase in operational GHG emissions as a result of the GTN Xpress Project at the compressor stations would be 129,932 metric tons of $CO2e$ per year.  All numbers in the discussion below have been updated to reflect the correct incremental increase.

[122] Final EIS at ES-4, 4-48, 4-50.  Full burn calculations are, in most cases, an overestimate because pipelines only operate at full capacity during limited periods of full demand.

**Exhibit 1**
**Page 29 of 79**

(assuming a discount rate of 5%), $2,895,307,401 (assuming a discount rate of 3%), $4,414,305,120 (assuming a discount rate of 2.5%) or $8,807,239,545 (using the 95th percentile of the social cost of GHGs with a discount rate of 3%).[123]  The final EIS states that "[m]odifying and installing the Project facilities would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[124]  We clarify that, assuming that the transported gas is not displacing equal- or higher-emitting sources, we recognize that the project's contributions to GHG emissions globally contribute to future climate change impacts,[125] including impacts in the region.[126]

65.     In its comments on the final EIS, the EPA reiterates previous comments that the EIS did not quantify the upstream emissions associated with natural gas production, processing, and transportation.  In addition, Southern Oregon Climate Action Now comments that an estimation of upstream emissions is needed.  This is not required here.  As explained below, the upstream emissions are not reasonably foreseeable.

66.     The environmental effects resulting from natural gas production are generally neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of an infrastructure project, as contemplated by CEQ's regulations.[127]  Here, the supply source associated with the capacity subscribed by Cascade and Intermountain is unknown, and it is unknown whether there will be any

---

[123] Final EIS at 4-51.  The Final EIS describes the method and assumptions staff used for calculating the social cost of GHGs.  *Id.* at 4-50 to 4-51.  The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[124] Final EIS at 4-47.

[125] *Id.*

[126] *Id.* at 4-45 to 4-47 (discussing observations from the Fourth Assessment Report).

[127] *E.g.*, *Equitrans, L.P.*, 183 FERC ¶ 61,200, at P 42 (2023); *see, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148, at P 93 (2023); *Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 F. App'x. 472, 474-75 (2d Cir. 2012) (unpublished opinion); *see also Nat'l Fuel Gas Supply Corp. Empire Pipeline, Inc.*, 164 FERC ¶ 61,084, at P 102 (2018).

**Exhibit 1**
**Page 30 of 79**

incremental development of production wells associated with the capacity subscribed by Tourmaline. That natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market does not mean that the Commission's approval of a particular infrastructure project will cause additional gas production.[128] Even knowing the identity of a producer of gas to be shipped on a pipeline and the general location of that producer's existing wells would not necessarily reveal whether additional wells would be induced.[129] Therefore, based on the lack of information showing that the project would induce additional production, we conclude that upstream GHG emissions are not reasonably foreseeable.

67.    As we have done in prior certificate orders, we compare estimated project GHG emissions to the total GHG emissions of the United States as a whole and at the state level. This comparison allows us to contextualize the project emissions of the project. We have updated this analysis from that in the final EIS based on comments received from GTN and updated emissions data. At a national level, 5,586 million metric tons of $CO_2e$ were emitted in 2021 (inclusive of $CO_2e$ sources and sinks).[130] Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2021 levels by 0.0001%; in subsequent years, the operation and reasonably foreseeable downstream GHG emissions could potentially increase emissions by 0.04%.

68.    At the state level, we compare the project's GHG emissions to Washington's, Oregon's, and Idaho's state emission inventories.[131] The project's total foreseeable downstream emissions were allocated to Washington, Oregon, and Idaho based on the service area of the shippers that have subscribed capacity. As noted above, end use for Tourmaline's subscribed capacity is not reasonably foreseeable. We assume that end use for Intermountain's 79,000 Dth/d of subscribed capacity would occur in Idaho, as that is Intermountain's service area. Cascade's 20,000 Dth/d of subscribed capacity could be

---

[128] *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145, at P 157 (2017), *order on reh'g*, 164 FERC ¶ 61,084.

[129] *Id.* P 163.

[130] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021 at ES-4* (Table ES-2) (April 2023), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

[131] In its comments on the final EIS, GTN stated that the state-wide emission reported in the final EIS for Idaho, Oregon, and Washington were inaccurately represented as metric tons of $CO_2e$ rather than metric tons of carbon dioxide, which led to an overstatement of the contextual weight of GHG emissions attributed to the project. GTN is correct. Commission staff has revised the analysis and the updated numbers are included in this order.

**Exhibit 1**
**Page 31 of 79**

used in either Washington or Oregon based on Cascade's service area, so we allocate the total to each state for purposes of our context calculations, as a conservative approach. In 2020, 19.4 million metric tons of $CO_2e$ were emitted in the state of Idaho; 68.4 million metric tons of $CO_2e$ were emitted in the state of Washington; and 37.5 million metric tons of $CO_2e$ were emitted in the state of Oregon.[132] Accordingly, construction emissions from the project could potentially increase $CO_2e$ emissions in Washington by 0.004% and in Oregon by 0.009%. In subsequent years, the operation and reasonably foreseeable downstream GHG emissions could potentially increase emissions by 8% in Idaho, by 0.7% in Washington, and by 1.1% in Oregon.

69.     When states have GHG emissions reduction targets, we will compare the project's GHG emissions to those state goals to provide additional context. The state of Washington has a GHG emissions goal of reducing GHGs by 95% by 2050 based on 1990's GHG emission levels. In 1990, based on EPA's Emissions Inventory, Washington emitted 90.5 million metric tons of $CO_2e$, as such their 2050 reduction goal would be annual GHG emissions of 4,525,000 metric tons of $CO_2e$. The project's operational emissions and reasonably foreseeable downstream emissions would constitute 11% of Washington's 2050 reduction target. The state of Oregon has goals to reduce emissions by 80% of 1990 levels by 2050. In 1990 based on EPA's emissions Inventory, Oregon emitted 43.7 million metric tons of GHGs. As such, their reduction goal would be an annual GHG emissions of 8,740,000 metric tons of $CO_2e$. The project's operational emissions and reasonably foreseeable downstream emissions would constitute 4.6% of Oregon's 2050 reduction target. The state of Idaho does not have statewide GHG emissions goals.

70.     The Pipeline Safety Trust commented that it is unclear how the project would not have increased fugitive emissions at the Athol and Kent Compressor Stations. Emissions from fugitive components were estimated using design documents to determine the quantity of components and using EPA emission factors for oil and gas facilities. We note that although the final EIS states that there would be no increase in fugitive emissions from the Athol and Kent Compressor Stations, Table 4.9-2 of the final EIS shows that the proposed potential to emit (PTE) at the Athol Compressor Station is 15.18 tons per year (tpy) of volatile organic compound (VOC) emissions and 41,793 tpy of $CO_2e$ due to equipment leaks. The existing PTE for equipment leaks at the Athol Compressor Station is 8.66 tpy of VOCs and 23,845 tpy of $CO_2e$. Table 4.9-2 shows that the proposed PTE at the Kent Compressor Station is 26.78 tpy of VOC and 73,758 tpy of $CO_2e$ due to equipment leaks. The existing PTE for equipment leaks at the Kent

---

[132] U.S. Energy Information Administration, Table 1, State Energy-Related Carbon Dioxide Emissions by Year, Unadjusted (Oct. 11, 2022).

**Exhibit 1**
**Page 32 of 79**

Compressor Station is 20.26 tpy of VOCs and 17,948 tpy of $CO_2e$.[133]  Therefore, the final EIS correctly shows that there would be an increase in fugitive emissions at the stations due to the proposed modifications, and we correct the record in regard to the statement in the final EIS that there would not be an increase in fugitive emissions.  As stated in the final EIS, the project would result in continued compliance with the National Ambient Air Quality Standards (NAAQS) and GTN has obtained air quality permits, as applicable.  Thus, even noting the increase in fugitive emissions at the stations, we continue to conclude that the project would not result in significant impacts to local or regional air quality.

71.    Several commenters state that the Commission should have determined whether the project's GHG emissions will have a significant environmental impact.  The Final EIS states that it "include[d] a disclosure of the social cost of GHGs . . . to assess climate impacts generated by each additional metric ton of GHGs emitted by the Project."[134]  We clarify that for informational purposes, Commission staff disclosed an estimate of the social cost of GHGs.[135]  While we have recognized in some past orders that social cost of GHGs may have utility in certain contexts such as rulemakings,[136] we have also found that calculating the social cost of GHGs does not enable the Commission to determine credibly whether the reasonably foreseeable GHG emissions associated with a project are significant or not significant in terms of their impact on global climate change.[137]  Currently, however, there are no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria.[138]  Nor are we aware of any other currently scientifically accepted method that

[133] Final EIS at 4-39 – 4-41.

[134] *Id.* at 4-50.

[135] *Id.* at 4-50 to 4-51.  We note that "Commission staff have not identified a methodology to attribute discrete, quantifiable, physical effects on the environment resulting from the Project's incremental contribution to GHGs."  *Id.* at 4-47.

[136] *Fla. Se. Connection, LLC*, 164 FERC ¶ 61,099, at PP 35-37 (2018).

[137] *See Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, (2017), *aff'd sub nom.*, *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019); *Del. Riverkeeper v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022).  The social cost of GHGs tool merely converts GHG emissions estimates into a range of dollar-denominated figures; it does not, in itself, provide a mechanism or standard for judging "significance."

[138] *Tenn. Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 at P 37; *see also Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296, *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-297 (2018), *aff'd*, *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at 2 (D.C. Cir. Feb. 19, 2019) (unpublished) ("[The Commission] gave several

**Exhibit 1**
**Page 33 of 79**

would enable the Commission to determine the significance of reasonably foreseeable GHG emissions.[139] The D.C. Circuit has repeatedly upheld the Commission's decisions not to use the social cost of carbon, including to assess significance.[140] In fact, the D.C. Circuit recently affirmed the Commission's decision to not analyze the Social Cost of Carbon in its NEPA analysis,[141] rejected the suggestion that it was required to do so,

reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act. That is all that is required for NEPA purposes."); *EarthReports v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (accepting the Commission's explanation why the social cost of carbon tool would not be appropriate or informative for project-specific review, including because "there are no established criteria identifying the monetized values that are to be considered significant for NEPA purposes"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at P 75 (2022); *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14 (2023); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at P 91 (2022).

[139] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026 at P 14 ("there are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to identify any such appropriate criteria").

[140] *See*, *e.g.*, *Ctr. For Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) (*Alaska LNG*) (explaining that "the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions," "declined to apply the social cost of carbon for the same reasons it had given in a previous order"; describing those reasons as (1) "the lack of consensus about how to apply the social cost of carbon on a long time horizon," (2) that "the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such," and (3) "FERC has no established criteria for translating these dollar values into an assessment of environmental impacts"; and recognizing that the Commission's "approach was reasonable and mirrors analysis . . . previously upheld" and that the Commission "had no obligation in this case to consider the social cost of carbon") (citations omitted); *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things)); *Del. Riverkeeper v. FERC*, 45 F.4th 104 (also upholding the Commission's decision not to use the social cost of carbon); *Appalachian Voices v. FERC*, 2019 WL 847199 (D.C. Cir. 2019) (same).

[141] *Alaska LNG*, 67 F.4th at 1184 ("Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions. It declined to apply the social cost of carbon for the same reasons it had given in a previous order. . . FERC's approach was reasonable and mirrors analysis we have previously upheld.").

**Exhibit 1**
**Page 34 of 79**

found that the petitioner's arguments "fare no better when framed as NGA challenges," and then, in the very same paragraph, sustained the Commission's public interest determination as "reasonable and lawful."[142]

72.    We note that there currently are no accepted tools or methods for the Commission to use to determine significance, therefore the Commission is not herein characterizing these emissions as significant or insignificant.[143]    Accordingly, we have taken the required "hard look" and have satisfied our obligations under NEPA.

## 4.    Environmental Justice

73.    In conducting NEPA reviews of proposed natural gas projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).[144]    Executive Order 14008 also directs agencies to develop "programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts."[145]

[142] *Id.*

[143] The February 18, 2022 Interim GHG Policy Statement, Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs., 178 FERC ¶ 61,108 (2022) which proposed to establish a NEPA significance threshold of 100,000 tons per year of CO2e as a matter of policy, has been converted to draft status, and opened to further public comment.  *Order on Draft Policy Statements*, 178 FERC ¶ 61,197, at P 2 (2022).

[144] Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994).  While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our governing regulations and guidance, and statutory duties.  15 U.S.C. § 717f; *see also* 18 C.F.R. § 380.12(g) (2022) (requiring applicants for projects involving significant aboveground facilities to submit information about the socioeconomic impact area of a project for the Commission's consideration during NEPA review); FERC, *Guidance Manual for Environmental Report Preparation* at 4-76 to 4-80 (Feb. 2017).

[145] Exec. Order No. 14,008, 86 Fed. Reg. 7619 (Jan. 27, 2021).  The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution.  *Id.* at 7629.  The term also includes, but may not be limited to minority populations, low-income

**Exhibit 1**
**Page 35 of 79**

Environmental justice is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies."[146]

74.    Consistent with the CEQ[147] and EPA[148] guidance and recommendations, the Commission's methodology for assessing environmental justice impacts considers: (1) whether environmental justice communities (e.g., minority or low-income

populations, or indigenous peoples. *See* EPA, *EJ 2020 Glossary* (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ej-2020-glossary.

[146] EPA, *Learn About Environmental Justice*, https://www.epa.gov/environmentaljustice/learn-about-environmental-justice (Sept. 6, 2022).  Fair treatment means that no group of people should bear a disproportionate share of the negative environmental consequences resulting from industrial, governmental, and commercial operations or policies.  *Id.*  Meaningful involvement of potentially affected environmental justice community residents means:  (1) people have an appropriate opportunity to participate in decisions about a proposed activity that may affect their environment and/or health; (2) the public's contributions can influence the regulatory agency's decision; (3) community concerns will be considered in the decision-making process; and (4) decision makers will seek out and facilitate the involvement of those potentially affected.  *Id.*

[147] CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 4 (Dec. 1997) (CEQ's *Environmental Justice Guidance*), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  CEQ offers recommendations on how federal agencies can provide opportunities for effective community participation in the NEPA process, including identifying potential effects and mitigation measures in consultation with affected communities and improving the accessibility of public meetings, crucial documents, and notices.  GTN conducted environmental justice community outreach activities in the vicinity of the Starbuck and Athol Compressor Stations.  In addition, GTN has maintained a virtual open house website since October 2021.  *See* Final EIS at 4-22.  There were also opportunities for public involvement during the Commission's environmental review processes.  *See* Final EIS at 4-21 to 4-22.

[148] *See generally* Interagency Working Group for Environmental Justice, *Promising Practices for EJ Methodologies in NEPA Reviews* (Mar. 2016) (*Promising Practices*), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf.

**Exhibit 1**
**Page 36 of 79**

populations)[149] exist in the project area; (2) whether impacts on environmental justice communities are disproportionately high and adverse; and (3) possible mitigation measures.  As recommended in *Promising Practices*, the Commission uses the 50% and the meaningfully greater analysis methods to identify minority populations.[150] Specifically, a minority population is present where either:  (1) the aggregate minority population of the block groups in the affected area exceeds 50%; or (2) the aggregate minority population in the block group affected is 10% higher than the aggregate minority population percentage in the county.[151]

75.    CEQ's *Environmental Justice Guidance* also directs low-income populations to be identified based on the annual statistical poverty thresholds from the U.S. Census Bureau. Using *Promising Practices'* low-income threshold criteria method, low-income populations are identified as block groups where the percent of low-income population in the identified block group is equal to or greater than that of the county.

76.    To identify potential environmental justice communities in the project area, the final EIS used 2019 U.S. Census American Community Survey data[152] for the race, ethnicity, and poverty data at the state, county, and block group level.[153]  Additionally, in accordance with *Promising Practices*, Commission staff used EJScreen, EPA's environmental justice mapping and screening tool, as an initial step to gather information regarding minority and low-income populations, potential environmental quality issues, environmental and demographic indicators, and other important factors.

---

[149] *See generally* Exec. Order No. 12,898, 59 Fed. Reg. 7629.  Minority populations are those groups that include: American Indian or Alaskan Native; Asian or Pacific Islander; Black, not of Hispanic origin; or Hispanic.

[150] See *Promising Practices* at 21-25.

[151] Final EIS at 4-24.  The final EIS used Kootenai County, Idaho and Walla Walla County, Washington as the comparable reference communities to ensure that affected environmental justice communities were properly identified.  A reference community may vary according to the characteristics of the particular project and the surrounding communities.

[152] U.S. Census Bureau, *American Community Survey 2019 ACS 5-Year Estimates Detailed Tables, File# B17017, Poverty Status in the Past 12 Months by Household Type by Age of Householder*, https://data.census.gov/cedsci/table?q=B17017; File #B03002 Hispanic or Latino Origin By Race, https://data.census.gov/cedsci/table?q=b03002.

[153] *See* final EIS at 4-24.

**Exhibit 1**
**Page 37 of 79**

77.     Once Commission staff collected the block group level data,[154] staff conducted an impacts analysis for the identified environmental justice communities and evaluated health or environmental hazards, the natural physical environment, and associated social, economic, and cultural factors to determine whether impacts to environmental justice communities are disproportionately high and adverse.  The final EIS considered whether impacts were disproportionately high and adverse on environmental justice populations consistent with EPA's recommendations in *Promising Practices*[155] and also whether those impacts were significant.[156]  Identified project impacts and GTN's proposed mitigation measures are discussed below.

78.     Staff identified two block groups near the project facilities that exceed the defined thresholds for minority and/or low-income communities and are, therefore, environmental justice communities.  Staff identified one minority population (Kootenai County, Idaho - Census Tract 1.01, Block Group 2) and one minority and low-income population (Kootenai County, Idaho - Census Tract 2.03, Block Group 2) within one mile of the Athol Compressor Station; and one minority population (Walla Walla County, Washington - Census Tract 9200, Block Group 4) within one mile of the Starbuck Compressor Station.[157]  No environmental justice communities are present within one mile of the Kent Compressor Station.  The final EIS determined that potential impacts on the identified environmental justice communities may include socioeconomic impacts, traffic impacts, increased demand for temporary housing and public services, and noise and air impacts from construction and operation of the project.  Environmental justice

---

[154] *See id.* at 4-82, Table 4.7.2-1 (Minority Populations by Race and Ethnicity and Low-Income Populations in the Project Area).

[155] *Promising Practices* at 44-46 (explaining that there are a number of factors used to determine whether an action will cause a disproportionately high and adverse impact, and that one recommended approach is to consider whether an impact would be "predominantly borne by minority populations or low-income populations").  We recognize that EPA and CEQ are in the process of updating their guidance regarding environmental justice and we will review and incorporate that anticipated guidance in our future analysis, as appropriate.

[156] *Id.* at 33 (stating that "an agency may determine that impacts are disproportionately high and adverse, but not significant within the meaning of NEPA" and in other circumstances "an agency may determine that an impact is both disproportionately high and adverse and significant within the meaning of NEPA").

[157] Staff determined that a 1-mile radius was sufficiently broad considering the likely concentration of air emissions, noise, and traffic impacts proximal to the construction activities.

**Exhibit 1**
**Page 38 of 79**

concerns are not present for other resource areas such as geology, groundwater, surface water, wetlands, wildlife, visual resources, or cultural impacts due to the minimal overall impact the project would have on these resources.

79.    Regarding socioeconomic impacts, the final EIS concludes that construction activities will result in a nominal and temporary increase in non-local workforce. Additionally, the final EIS concludes that no new operational workforce would be required to operate the facilities and, thus, socioeconomic impacts on identified environmental justice communities would be minor and temporary.[158]  For traffic impacts, the final EIS acknowledges that movement of construction personnel, equipment, and materials would result in short-term impacts on roadways.  However, it states that the addition of 50 vehicle round-trips per day that have the potential to occur at the Starbuck Compressor Station and the occasional materials deliveries would not substantially impact traffic or local use of roads.  Additionally, due to the limited duration of the construction period, staff expects that construction workers would use existing temporary housing options such as hotels and motels, and campgrounds and RV parks within one hour's drive and would not require new housing to be constructed by the private sector or communities.  Commission staff found that any impact on local economies, housing, or demand for municipal services would also be minor given the scope of the project.[159]  We agree.

80.    Regarding noise impacts, at the Athol Compressor Station there would be no construction noise.  Operating the modified station would permanently increase noise emitted from the station by about 0.2 decibels (dB), measured at nearby noise-sensitive areas (NSA).  The final EIS states that a 0.2-dB increase in noise would not generally be perceptible at the numerous houses located between 800 and 1,500 feet from the station or in the surrounding community.  Similarly, environmental justice communities near the existing station would not likely experience an observable increase in noise as a result of the project.[160]

81.    At the Starbuck Compressor Station, uprating and installing the project facilities would result in varying noise levels on the closest NSA (a single residence, 0.5 mile from the station) ranging from 33.7 dB to 43.7 dB.  Operating the modified station would permanently increase noise at the nearest NSA by about 2.0 dB.  As stated in the final EIS, a 2.0-dB increase in noise would not generally be perceptible at the nearest NSA or in the surrounding community.  Similarly, environmental justice communities near the

[158] *See* Final EIS at 4-31.

[159] *Id.* at 4-31.

[160] *Id.*

**Exhibit 1**
**Page 39 of 79**

existing station would not likely experience an observable increase in noise as a result of the project.[161]

82.     For both the Athol and Starbuck Compressor Stations, construction and operational noise would remain below the Commission's day-night noise level of 55 A-weighted decibels threshold at nearby NSAs.  Additionally, a "blow down" event is not expected at the Athol Compressor Station, as GTN only proposes a software upgrade.  Should a "blow down" event occur at the Starbuck Compressor Station due to modification and installation activities, the resulting noise would not likely be perceptible at the closest NSA, approximately 0.5 mile away.  Therefore, staff concluded, and we agree, that the project facilities would result in a permanent, but minor noise impact on environmental justice communities.[162]

83.     During construction, exhaust emissions and fugitive dust would result in short-term, localized impacts in the immediate vicinity of construction work areas.  If necessary, GTN proposes to implement dust suppression measures to minimize the impacts of fugitive dust on sensitive areas.

84.     Operational emissions at the modified compressor stations would come from two primary sources:  (1) direct gas releases associated with operation and maintenance of the stations and (2) fugitive emissions.  GTN completed an air quality dispersion modeling analysis for the Athol and Starbuck Compressor Stations, which are located within environmental justice communities.

85.     For the Athol Compressor Station, the project's anticipated incremental and cumulative emissions are below the NAAQS for all criteria pollutants.  Additionally, the criteria pollutant emissions attributable to the project facilities would not exceed Significant Impact Levels.[163]  Staff concluded in the final EIS, and we agree, that the

[161] *Id.*

[162] *Id.* at 4-32.

[163] The NAAQS significant impact levels (SILs) are defined by EPA under its statutory authority.  The EPA has historically interpreted Clean Air Act section 165(a)(3) and associated regulations to mean that a source must have a "significant impact" on ambient air quality in order to cause or contribute to a violation of the NAAQS. 42 U.S.C. § 7475(a)(3).  Under this authority, EPA has established its SILs through its regulations and various guidance documents.  *See, e.g.,* EPA, Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, (April 17, 2018), https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf.  SILs are stated as emissions concentrations.  Exceeding a SIL triggers additional analyses to

**Exhibit 1**
**Page 40 of 79**

construction and operational emissions at the Athol Compressor Station would not have significant adverse air quality impacts on the environmental justice populations in the project area.[164]

86.    For the Starbuck Compressor Station, the project's anticipated incremental and cumulative emissions of criteria pollutants are below the NAAQS for all pollutants. Additionally, only nitrogen oxide and sulfur dioxide emissions would exceed Significant Impact Levels, and they would do so within 0.25 mile of the existing facility. The nearest sensitive receptor to the Starbuck Compressor Station is 0.5 mile away; therefore, no receptors would experience emissions above the Significant Impact Level. Staff concluded in the final EIS, and we agree, that the construction and operational emissions at the Starbuck Compressor Station would not have significant adverse air quality impacts on the environmental justice populations in the project area.[165]

87.    We note that although the project and compressor station would be in compliance with the NAAQS and the NAAQS are designated to protect sensitive populations, NAAQS attainment alone may not assure there is no localized harm to such populations due to project emissions of volatile organic compounds, hazardous air pollutants as well as issues, such as the presence of non-project related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate care. Overall, however, as discussed in section 4.9 of the final EIS,[166] and based on the foregoing, the construction and operational emissions from the project would not have significant adverse air quality impacts.

88.    As to cumulative impacts, no projects were identified within the geographic scope for the Athol and Starbuck Compressor Stations. Thus, there would be no cumulative environmental justice impacts.

89.    The final EIS concluded that impacts associated with the construction and operation of the Athol and Starbuck Compressor Stations on environmental justice communities would be disproportionately high and adverse as they would be

include ambient conditions. SILs are set conservatively to ensure protection of air quality.

[164] *Id.* at 4-33.

[165] *Id.*

[166] *Id*. at 4-34 – 4-51.

Exhibit 1
Page 41 of 79

predominately borne by environmental justice communities. However, these impacts would be less than significant.[167]

90.     Individuals and the Pipeline Safety Trust commented on the final EIS that the negative health impacts of methane gas warming the climate and polluting the air are unacceptable and disproportionately affect tribal, minority, and low-income communities. As noted above, construction and operation of the project would increase the atmospheric concentration of GHGs, in combination with past and future emissions from all other sources and would contribute incrementally to future climate change impacts. While the climate change impacts taken individually may be manageable for certain communities, the impacts of compounded extreme events (such as simultaneous heat and drought, or flooding associated with high precipitation on top of saturated soils) may exacerbate preexisting community vulnerabilities and have a cumulative adverse impact on environmental justice communities. However, as mentioned above, we do not characterize the project's GHG emissions as significant or insignificant because there currently are no accepted tools or methods for the Commission to use to determine significance.[168]

91.     In its comments on the final EIS, GTN states that in the final EIS, staff did not explain its departure from the draft EIS, which GTN contends had concluded that the project would not have disproportionately high and adverse impacts on environmental justice communities. The draft EIS concluded that "impacts associated with construction and operation of certain Project components may be predominately borne by environmental justice communities."[169] The draft EIS went on to state that "aside from the previously described insignificant impacts, the Project would not have disproportionately high and adverse impacts on environmental justice communities." [170] We clarify that the basis on which Commission staff determines impacts would be disproportionately high and adverse is if there are impacts associated with the proposed project that would be predominately borne by environmental justice communities. In addition, both the draft EIS and final EIS find that project impacts on environmental justice communities would be less than significant. We agree.

---

[167] *Id.*

[168] *See supra* P 72.

[169] Draft EIS at 4-32.

[170] *Id.*

**Exhibit 1**
**Page 42 of 79**

## 5. __Alternatives__

92.    Washington, Oregon, and California argue that the alternatives analysis in the final EIS is incomplete because it did not consider clean energy alternatives.[171]  Washington, Oregon, and California also state that the final EIS ignores ample evidence that such alternatives, like energy efficiency and electrification, exist.[172]  We disagree.

93.    NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal."[173]  The Commission has satisfied these procedural requirements.

94.    An applicant's statement of purpose and need informs the choice of alternatives considered by the Commission under NEPA.[174]  Courts have upheld federal agencies' use of applicants' project purpose and need in environmental documents and as the basis for evaluating alternatives.[175]  When an agency is asked to consider a specific proposal, the needs and goals of the parties involved in the application should be taken into account.[176]

95.    We recognize that a project's purpose and need may not be so narrowly defined as to preclude consideration of reasonable alternatives.  Nonetheless, an agency need only consider alternatives that will bring about the ends of the proposed action, and the evaluation is "shaped by the application at issue and by the function that the agency plays

---

[171] Washington, Oregon, & California February 10, 2023 Comment at 3.

[172] *Id.*

[173] 42 U.S.C. § 4332(c)(iii).

[174] CEQ advises that "a reasonable range of alternatives depends on the nature of the proposal and the facts in each case."  *CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (1981).

[175] *E.g.*, *City of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (*Citizens Against Burlington*); (explaining that the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process.").

[176] *Citizens Against Burlington*, 938 F.2d at 196.

**Exhibit 1**
**Page 43 of 79**

in the decisional process."[177]  Moreover, because the alternatives considered under NEPA are informed both by "the project sponsor's goals,"[178] as well as "the goals that Congress has set for the agency,"[179] *i.e.*, the goals set in enacting the NGA, the Commission's consideration of alternatives includes the no-action alternative and alternatives that achieve the purpose of the project.

96.    Alternatives may be eliminated if they will not achieve a project's goals or are otherwise unreasonable.[180]  As stated in the final EIS, the project's purpose is to serve the firm transportation requirements of its shippers.[181]  Energy efficiency and non-gas alternatives were excluded because these alternatives do not provide for the transportation of natural gas and would therefore not achieve the project's aims.[182] Moreover, the Commission has previously recognized that "[u]nsupported, hypothetical alternatives are not reasonable alternatives that warrant further NEPA consideration."[183] Washington, Oregon, and California do not support the energy efficiency and non-gas

---

[177] *Id.* at 199; *see also Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 598-99 (4th Cir. 2018) (*Sierra Club*) (finding the statement of purpose and need for a Commission-jurisdictional natural gas pipeline project that explained where the gas must come from, where it will go, and how much the project would deliver, allowed for a sufficiently wide range of alternatives but was narrow enough that there were not an infinite number of alternatives).

[178] *Citizens Against Burlington*, 938 F.2d at 196.

[179] *Sierra Club v. U.S. Forest Serv.*, 897 F.3d at 598-99.

[180] *See also Alaska LNG*, 67 F.4th at 1182("Because some alternatives will be impractical or fail to further the proposed action's purpose, agencies may reject unreasonable alternatives after only brief discussion.").

[181] Final EIS at 2.

[182] S*ee, e.g., Columbia Gas Transmission, LLC*, 164 FERC ¶ 61,036, at P 65 & n.147 (2018), *order denying reh'g*, 170 FERC ¶ 61,247 (2020) ("As we have concluded with respect to other natural gas transportation infrastructure projects, we do not find that the potential for energy conservation and renewable energy sources to be practical alternatives."); *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (2017) (recognizing that "renewable energy is not a comparable replacement for the transportation of natural gas").

[183] *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (internal quotation and citation omitted).

**Exhibit 1**
**Page 44 of 79**

alternatives in any detail.  For these reasons, we disagree that the final EIS should have considered energy efficiency and non-gas alternatives.

97.    The final EIS examined three alternatives to the proposed project:  (1) a no-action alternative; (2) a pipeline looping alternative; and (3) an electrical compression alternative.  Even though the no-action alternative would result in fewer environmental impacts than the proposed project, it would not meet the project's objectives. Commission staff evaluated two other alternatives to determine whether environmental impacts associated with the project could be avoided or reduced.  Commission staff found that constructing the pipeline loops would impact more than 900 acres of land compared to the 46.9 acres of land required to construct the GTN XPress Project facilities.[184] Additionally, staff found that in order to use an electric compressor, a 38-mile-long, high-voltage transmission line and electric substation would need to be installed, which would impact at least 375 acres of land and require the crossing of at least 23 waterbodies.[185] Staff therefore concluded that these alternatives would result in a significant increase in impacts on the environment.  The final EIS properly considered alternatives to the GTN XPress Project.

## 6.    Environmental Impact Conclusion

98.    We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the GTN XPress Project, as well as the other information in the record.  We are accepting the environmental recommendations, with a modification to recommended environmental condition 7 as discussed above, in the final EIS and are including them as conditions in the appendix to this order.  Based on our consideration of this information, as supplemented or clarified herein, we agree with the conclusions presented in the final EIS and find that the project, if implemented as described in the final EIS, and further addressed herein, is an environmentally acceptable action.  We note that the analysis in the final EIS provides substantial evidence for our conclusions in this order, but that it is the order itself that serves as the record of decision, consistent with the Commission's obligations under NEPA and the Administrative Procedure Act.  For that reason, to the extent that any of the analysis in the final EIS is inconsistent with or modified by the Commission's analysis and findings in the order, it is the order that controls and we do not rely on or adopt any contrary analysis in the final EIS.

[184] Final EIS at 3-4.

[185] *Id.* at 3-4 – 3-5.

**Exhibit 1**
**Page 45 of 79**

IV.   **Conclusion**

99.    The proposed project will enable GTN to provide up to 150,000 Dth/d of firm transportation service on its existing system for delivery into Idaho and Pacific Northwest markets.  We find that GTN has demonstrated a need for the GTN XPress Project, that the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of the project, subject to the conditions in this order.

100.    As noted above, the project is an environmentally acceptable action and compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analysis.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during abandonment, construction, and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

101.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[186]

---

[186] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

**Exhibit 1**
**Page 46 of 79**

102.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record.

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to GTN, authorizing it to construct and operate the proposed GTN XPress Project, as described and conditioned herein, and as more fully described in the application and subsequent filings, including any commitments made therein.

(B)    The certificate issued in Ordering Paragraph (A) is conditioned on GTN's:

    (1)    completion of construction of the proposed facilities and making them available for service within three years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

    (2)    compliance with all applicable Commission's regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

    (3)    compliance with the environmental conditions listed in the Appendix to this order.

(C)    GTN shall file a written statement affirming that it has executed firm contracts for the capacity levels and terms of service represented in its filed precedent agreement, prior to commencing construction.

(D)    GTN's existing system recourse charges, fuel rate, and line loss percentage for transportation under Rate Schedule FTS-1 are approved as the initial recourse charges for the project.

(E)    GTN's request for a predetermination that all the costs of the project should be rolled into its system rates in a future general NGA section 4 rate case is denied.

(F)    GTN shall keep separate books and accounting of costs attributable to the proposed services, as more fully described above.

**Exhibit 1**
**Page 47 of 79**

(G)    GTN shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies GTN.  GTN shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Danly is concurring in part and dissenting in part
                    with a separate statement attached.
                    Commissioner Clements is concurring in part and dissenting in part
                    with a separate statement attached.


( S E A L )




                                    Kimberly D. Bose,
                                    Secretary.

**Exhibit 1**
**Page 48 of 79**

## Appendix

## Environmental Conditions

As recommended in the final Environmental Impact Statement (EIS), and otherwise amended herein, this authorization includes the following conditions:

1.   Gas Transmission Northwest LLC (GTN) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  GTN must:

   a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

   b.   justify each modification relative to site-specific conditions;

   c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and

   d.   receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.   The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  This authority shall allow:

   a.   the modification of conditions of the Order;

   b.   stop-work authority; and

   c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation activities.

3.   **Prior to any construction**, GTN shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, Environmental Inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming

**Exhibit 1**
**Page 49 of 79**

involved with construction and restoration activities.

4.  The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction**, GTN shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order. All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

    GTN's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations. GTN's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.  GTN shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

    This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

    Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

    a.  implementation of cultural resources mitigation measures;

    b.  implementation of endangered, threatened, or special concern species

**Exhibit 1**
**Page 50 of 79**

mitigation measures;

c.      recommendations by state regulatory authorities; and

d.      agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.      **Within 60 days of the acceptance of the authorization and before construction begins**, GTN shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  GTN must file revisions to the plan as schedules change.  The plan shall identify:

a.      how GTN will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

b.      how GTN will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.      the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.      company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.      the location and dates of the environmental compliance training and instructions GTN will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

f.      the company personnel (if known) and specific portion of GTN's organization having responsibility for compliance;

g.      the procedures (including use of contract penalties) GTN will follow if noncompliance occurs; and

h.      for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

(1)      the completion of all required surveys and reports;

(2)      the environmental compliance training of onsite personnel;

**Exhibit 1**
**Page 51 of 79**

   (3) the start of construction; and

   (4) the start and completion of restoration.

7. GTN shall employ at least one EI.  The EI shall be:

  a. responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

  b. responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

  c. empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

  d. a full-time position, separate from all other activity inspectors;

  e. responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

  f. responsible for maintaining status reports.

8. Beginning with the filing of its Implementation Plan, GTN shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete.  On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

  a. an update on GTN's efforts to obtain the necessary federal authorizations;

  b. the construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

  c. a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

  d. a description of the corrective actions implemented in response to all instances of noncompliance;

**Exhibit 1**
**Page 52 of 79**

e.     the effectiveness of all corrective actions implemented;

f.     a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

g.     copies of any correspondence received by GTN from other federal, state, or local permitting agencies concerning instances of noncompliance, and GTN's response.

9.     GTN must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any project facilities.** To obtain such authorization, GTN must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.    GTN must receive written authorization from the Director of OEP, or the Director's designee, **before placing the project into service**. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

11.    **Within 30 days of placing the authorized facilities in service**, GTN shall file an affirmative statement with the Secretary, certified by a senior company official:

a.     that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b.     identifying which of the conditions in the Order GTN has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12.    GTN shall file a noise survey with the Secretary **no later than 60 days** after placing each modified compressor station in service. If a full power load condition noise survey is not possible, GTN shall provide an interim survey at maximum possible horsepower load and provide the full load survey **within 6 months**. If the noise attributable to the operation of the equipment at each Compressor Station under interim or full horsepower load conditions exceeds an day-night sound level of 55 decibels on the A-weighted scale at any nearby noise sensitive areas, GTN shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-

**Exhibit 1**
**Page 53 of 79**

service date.  GTN shall confirm compliance with the above requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

**Exhibit 1**
**Page 54 of 79**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest, LLC                          Docket No.  CP22-2-000

(Issued October 23, 2023)

DANLY, Commissioner, *concurring in part and dissenting in part*:

1.      I write separately to identify the specific aspects of today's order with which I concur and those elements from which I dissent.

##  I.      I Concur in Part with Today's Order.

2.      I concur in the Commission's decision to grant Gas Transmission Northwest LLC (GTN) an authorization under section 7(c) of the Natural Gas Act (NGA)[1] to install, construct, modify, and operate certain natural gas compression facilities at the existing No. 5 Athol, No. 7 Starbuck, and No. 10 Kent Compressor Stations, located in Kootenai County, Idaho, Walla Walla County, Washington, and Sherman County, Oregon, respectively (GTN XPress Project).[2]  The need for the project is amply demonstrated by the long-term precedent agreements that GTN entered into with shippers for 100% of the project's capacity.[3]

3.      Additionally, I concur in the determinations in paragraphs 71 and 72:  the social cost of greenhouse gases (GHG) is neither useful nor part of the Commission's decision making and the Commission offers no means by which to assess the significance of GHG emissions.[4]  Specifically, paragraphs 71 and 72 explain: (1) the disclosure of the social cost of GHG emissions is "for informational purposes"; (2) for the social cost of GHGs,

[1] 15 U.S.C. § 717f(c).

[2] *See Gas Transmission Northwest LLC*, 185 FERC ¶ 61,035 (2023) (*GTN*).

[3] *Id*. P 18 ("GTN has entered long-term precedent agreements with shippers for 100% of the project's capacity.  Precedent agreements for 100% of the project's capacity are significant evidence of the need for the proposed project."); *see also* Application at 1 ("GTN has executed binding amended and restated precedent agreements . . . with three shippers . . . which contemplate GTN's provision of long-term firm transportation service of one hundred percent (100%) of the Project capacity, a total of 150,000 Dth/d, commencing November 1, 2023.").

[4] *See GTN*, 185 FERC ¶ 61,035 at PP 71-72.

**Exhibit 1**
**Page 55 of 79**

"there are no criteria to identify what monetized values are significant for [National Environmental Policy Act (NEPA)] purposes"; (3) the Commission is not "aware of any . . . method," including the social cost of GHGs, "that would enable the Commission to determine the significance of reasonably foreseeable GHG emissions"; and (4) therefore, there are "no accepted tools or methods for the Commission to use to determine significance."[5]  This language made its first appearance in orders on the April 20, 2023 open meeting.[6]  I voted for this language, as did two of my colleagues, Chairman Phillips and Commissioner Christie.[7]

4.      Additionally, I concur in the Commission's declaration that it is the Commission's order that controls and therefore any language in the Final Environmental Impact Statement (Final EIS) that is in tension with the Commission's order is not relied upon or adopted by the Commission.[8]  We have had to resort to this language due to

---

[5] *Id.*

[6] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023); *Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047, at PP 20-21, 25 (2023); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046, at PP 92-94, 101 (2023); *see also Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 at P 20 ("although we are including the social cost of GHG figures for informational purposes, we find that because the social cost of GHGs tool was not developed for project level review and, as discussed below, does not enable the Commission to credibly determine whether the GHG emissions are significant, section 1502.21 of the [Council on Environmental Quality (CEQ)] regulations does not require its use in this proceeding"); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at P 92 (same) (collectively, April Orders).

[7] I pause to note that the referenced language was not included in an order voted on at the July 27, 2023 Commission meeting.  *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (2023).  I am pleased that the language is included in this issuance, and I want to emphasize that the language, as included in this order, does not intertwine my colleagues' view that downstream GHG emissions from local distribution companies are reasonably foreseeable—a position that I have consistently disagreed with and continue to disagree with, as explained below—with the language explaining that there is no means by which the Commission can determine the significance of an amount of GHG emissions.

[8] *See GTN*, 185 FERC ¶ 61,035 at P 98 ("We note that the analysis in the [F]inal EIS provides substantial evidence for our conclusions in this order, but that it is the order itself that serves as the record of decision, consistent with the Commission's obligations under NEPA and the Administrative Procedure Act.  For that reason, to the extent that any of the analysis in the [F]inal EIS is inconsistent with or modified by the Commission's analysis and findings in the order, it is the order that controls and we do

**Exhibit 1**
**Page 56 of 79**

inconsistencies between the environmental documents issued by staff and the contents of the Commission's orders.[9]


not rely on or adopt any contrary analysis in the [F]inal EIS.").

[9] *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (Danly, Comm'r, dissenting in part at P 14) ("We have witnessed environmental documents including language that runs contrary to Commission orders.") (citations omitted). *Compare* WBI Energy Transmission, Inc. Wahpeton Expansion Project Final EIS, Docket No. CP22-466-000, at 4-118 (Apr. 7, 2023) ("The Commission stated in a recent Order that a project's share of contribution to GHG emissions at the national level provides a reasoned basis to consider the significance of the Project's GHG emissions and their potential impact on climate change; and when states have GHG emissions reduction targets, the Commission will endeavor to consider the GHG emissions of a project on those state goals (or state inventories if the state does not have emissions targets.)") (citing *N. Nat. Gas Co.*, 174 FERC ¶ 61,189, at P 29 (2021) (*Northern Natural*)), *with Tenn. Gas Pipeline Co., L.L.C.*, 178 FERC ¶ 61,199 (2022) (Danly, Comm'r, concurring in the judgment at PP 2-3) (disagreeing with *Northern Natural* and explaining that "there is no standard by which the Commission could, consistent with our obligations under the law, ascribe significance to a particular rate or volume of GHG emissions") (citation omitted), *and with Tenn. Gas Pipeline Co., L.L.C.*, 178 FERC ¶ 61,199 (Phillips & Christie, Comm'rs, concurring at P 2) ("depart[ing] from *Northern Natural*, where the Commission stated that emissions for a project were not significant," explaining that "[i]n *Northern Natural*, the Commission disclosed the yearly emissions volumes and the estimated contribution to national and state emissions estimates, and then stated that, based on this record, that the emissions were not significant," and stating that "[i]t is not clear how this determination was made or how a finding of 'significance' would have affected our duties and authority under the Natural Gas Act") (citations omitted). *Compare* Boardwalk Storage Co. LLC BSC Compression Replacement Project Environmental Assessment, Docket No. CP22-494-000, at 48 (Mar. 13, 2023) ("We include a disclosure of the social cost of GHGs (also referred to as the [']social cost of carbon' [SCC]) to assess climate impacts generated by each additional metric ton of GHGs emitted by the Project."), *with Golden Pass LNG Terminal LLC*, 180 FERC ¶ 61,058, at P 24 (2022) (rejecting an argument raised in a comment that "the [Environmental Assessment (EA)] should use the social cost of GHGs (also referred to as the 'social cost of carbon' [SCC]) to assess climate impacts generated by each additional ton of GHGs that would be emitted or saved as a result of authorizing the proposed amendment, and that all GHG emissions are significant" by explaining that "we are not relying on or using the social cost of GHGs estimates to make any finding or determination regarding either the impact of the project's GHG emissions or whether the project is in the public convenience and necessity") (citations omitted). Notably, the Commission does not review or approve the contents of the EAs and EISs issued by staff.

**Exhibit 1**
**Page 57 of 79**

5.     Before I turn to the parts of the order from which I dissent, I want to address an argument raised by commenters who said that the "project capacity is not needed because state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas" and that "the precedent agreements with Cascade, Intermountain, or Tourmaline do not demonstrate that the project is needed for various reasons, as discussed further below, including because state climate legislation will reduce demand."[10]  The need for this project is readily demonstrated by the precedent agreements for 100% of the project capacity.  Whether or not a party presents evidence that "state policies intended to reduce GHG emissions will significantly reduce regional demand for natural gas"[11] is irrelevant to the inquiry required under section 7 of the NGA.[12]  And while states may enact policies that have an effect on the ultimate consumers of natural gas (generators, gas appliances and the like), these enactments cannot obstruct the Commission's exclusive jurisdiction over the "transportation of natural gas in interstate commerce" and "the sale in interstate commerce of natural gas for resale."[13]  To the extent to which commenters have advanced an argument that restrictions imposed by states on natural gas could implicitly impair FERC's authority and obligations under section 7 of the NGA, those arguments are unavailing.

## II.     I am Compelled to Dissent in Part.

6.     I shall start with a warning to all who take an interest in the Commission's NGA section 7 issuances.  Every such reader should pay close attention to our orders.

Staff, for those documents, act under the supervision of the Chairman.  *See also* 42 U.S.C. § 7171(c) (explaining that "[t]he Chairman shall be responsible *on behalf of the Commission* for the executive and administrative operation of the Commission, including functions of the Commission with respect to . . . the supervision of personnel employed by or assigned to the Commission, except that each member of the Commission may select and supervise personnel for his personal staff . . . .") (emphasis added).  But great care must be exercised to ensure that environmental documents adhere to Commission precedent.  *Cf. Great River Hydropower, LLC*, 135 FERC ¶ 61,151, at P 44 (2011) (explaining that if a delegated order "is inconsistent with [Commission] precedent . . . , it was wrongly decided").

[10] *GTN*, 185 FERC ¶ 61,035 at P 25.

[11] *Id*.

[12] *See* 15 U.S.C. § 717f.

[13] 15 U.S.C. § 717(b); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) ("The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.") (citation omitted).

**Exhibit 1
Page 58 of 79**

Language in the Commission's orders is changing—and over my objection. While drastic and profound changes were attempted by means of dramatic policy statements less than two years ago, the orders that have issued at this meeting and over the last few months have been putting in place much of the groundwork necessary for later implementation of the very policies set forth in the now-draft policy statements. In particular, pay attention in every issuance to the description of need, my colleagues' discussions on upstream GHG emissions, downstream GHG emissions, and any articulation of standards. Pay attention to the arguments my colleagues intentionally fail to address. Not only do those failures to respond to well-pleaded arguments expose our issuances to remand and possible vacatur under the Administrative Procedure Act upon appeal, they also are quite instructive to the public as they expose the locus of the greatest disagreements among the Commission's members. Ask yourself, in each case, why would at least one of the non-dissenting Commissioners be reluctant (or, for that matter, adamantly refuse) to allow a discussion of that topic in a Commission issuance when failure to respond is so dangerous to the durability of our orders. Finally, pay attention to Commission staff's environmental documents and whether such documents accurately implement the Commission's position for GHG emissions and social cost of carbon or whether it is more likely an example of staff drafting contrary to the Commission's will. In every case, ask yourself, were we to take this new language and expand it to its logical limits, what policy objectives would be achieved. I fear that the Commission is now attempting to achieve by seriatim orders what it was unable to achieve through a generic proceeding. At a minimum, the Commission is preserving its ability to do so in the future.

7.     Before turning to specifics, while there are various individual statements and determinations in this order with which I disagree, there are also larger, more substantial problems which expose this order to profound risk on petition for review. While this issuance, unlike the orders on the July Commission meeting, at least now acknowledges Congress' recent enactment amending the National Environmental Policy Act, the Commission continues to avoid the implementation of the Fiscal Responsibility Act of 2023, and more specifically the "Builder Act."[14] Today's order also violates the Administrative Procedure Act (APA), is inconsistent with Supreme Court precedent regarding the implementation of the NEPA, and it unwisely abandons recent Commission practice in our treatment of the social cost of GHGs.

8.     Pausing for a moment to remind the reader of fundamentals, we must first examine the scope of our inquiry under the public convenience and necessity standard. The Supreme Court has found that NGA section "7(e) requires the Commission to evaluate all

---

[14] *See* Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat 10, at § 321 (June 3, 2023) (providing the "Builder Act") (FRA).

**Exhibit 1**
**Page 59 of 79**

factors bearing on the public interest."[15]  This obligation, however, is not unlimited in scope and this requirement cannot be read in a vacuum.  The Supreme Court has explained that the inclusion of the term "public interest" in our statute is not "a broad license to promote the general public welfare"—instead, it "take[s] meaning from the purposes of the regulatory legislation."[16]  The purpose of the NGA, as the Supreme Court has instructed us, is "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."[17]  To the extent to which any Commission issuance attempts to expand the subjects we consider in our inquiry under the public convenience and necessity standard (as, for example, is contemplated by the now-draft Updated Certificate Policy Statement),[18] I reiterate my view that any regime we institute must "take meaning" from the purpose of the NGA.

9.    One more observation—and one that is worth taking a moment to discuss—is the decision to prepare an EIS in this proceeding.  Contrary to suggestions in this order that Commission staff prepared an EIS "[t]o satisfy the requirements of the [NEPA],"[19] an EIS was not required under NEPA.  I am confident that an EA would have sufficed for this proceeding.  Observers of the Commission's proceedings likely noticed an uptick in the number of EISs prepared since 2021.  Such a trend had nothing to do with requirements under NEPA, but rather, stemmed from the whims of the Chairman at that time overseeing staff.[20]  For those unfamiliar with the inner workings of the Commission,

[15] *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959).

[16] *NAACP v. FPC*, 425 U.S. 662, 669 (1976) (*NAACP*).

[17] *Id.* at 669-70; *accord Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (quoting *NAACP*, 425 U.S. at 669-70).  I note that the Supreme Court has also recognized the Commission has authority to consider "other subsidiary purposes," such as "conservation, environmental, and antitrust questions." *NAACP*, 425 U.S. at 670 & n.6 (citations omitted).  But all subsidiary purposes are, necessarily, subordinate to the statute's primary purpose.

[18] *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Certificate Policy Statement); *see Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022) (Order on Draft Policy Statements) (converting the two policy statements issued on February 18, 2022, Updated Certificate Policy Statement, 178 FERC ¶ 61,107 and *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement), to "draft" policy statements).

[19] *GTN*, 185 FERC ¶ 61,035 at P 57.

[20] *See, e.g.*, Commissioner Danly Letter Responding to Senator Barrasso Regarding Docket No. CP20-27, *et al.*, at 1 (Nov. 29, 2021),

**Exhibit 1**
**Page 60 of 79**

the Commission itself (*i.e.*, the corporate body composed of the sitting commissioners) does not typically decide whether Commission staff prepares an EIS versus an EA in a particular proceeding.  That power rests, as the director of Commission staff, with the Chairman alone.

### A.     The Commission Should Implement the Builder Act in its NGA Authorizations.

10.     I dissent from the order to the extent that it does not implement the terms of the FRA.  While this order, unlike earlier issuances in July, at least now acknowledges the fact that Congress recently amended the NEPA, the Commission continues to avoid the implementation of the FRA, and more specifically the "Builder Act."[21]  As today's order notes, Congress recently made the first revisions to NEPA since the statute's enactment when it passed the FRA, in particular, that part of the FRA known as the "Builder Act."[22]  The Commission should not be so reticent to pursue substantial changes to the process by which it discharges its duties under NEPA.  The Builder Act does not include an implementation period provision, so the statute became effective when the President signed it into law.  While the order hints that the Commission will wait for CEQ to offer its interpretation of the statute, there is certainly no legal reason that it must (or can) await CEQ's determinations.  Besides which, whether CEQ's interpretations of NEPA in guidance documents or regulations bind independent agencies is a "thorny question,"[23] and there is ample reason to doubt that they do.

11.     Among other revisions, the Builder Act changed the requirement that agencies include in environmental documents an analysis of the "environmental impact of the

https://www.ferc.gov/media/commissioner-danly-letter-responding-senator-barrasso-regarding-docket-nos-cp20-27-et-al (explaining that I disagree with Chairman Glick's "frequent[] claim[] . . . that recent judicial precedent . . . requires the Commission to prepare supplemental Environmental Impact Statements (EIS) to satisfy the requirements of the [NEPA], when examining a project's effects on climate change" and further explaining that "the Commission had routinely satisfied its NEPA obligations with Environmental Assessments when evaluating such effects").

[21] *See* FRA, Pub. L. 118-5, 137 Stat 10, at § 321 (providing the "Builder Act").

[22] *See id.*

[23] *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (citing *Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1119 (D.C. Cir. 2021) (Randolph, J., concurring) (questioning CEQ's authority to promulgate binding regulations)).

**Exhibit 1**
**Page 61 of 79**

proposed action"[24] to an analysis of the "reasonably foreseeable environmental effects of the proposed *agency* action."[25]  In my view, Congress's revisions reaffirm *Public Citizen*[26] which held that under NEPA, agencies are only obligated to consider environmental effects for which the *agency action itself* is the legal proximate cause.[27]

12.    Given this new statutory language, FERC has an opportunity to clarify the appropriate metes and bounds of its obligations under NEPA in light of the jurisdictional limits of the NGA.  Such clarification is particularly called for given the U.S. Court of Appeals for the District of Columbia Circuit's (D.C. Circuit) mischaracterization of the scope of FERC's authority in *Sabal Trail*[28] and its progeny.  *Sabal Trail* miscasts the nature of FERC's analysis of the public convenience and necessity under section 7 of the NGA[29] to hold that the Commission has an obligation to consider the GHG emissions from the end use of the gas transported by certificated pipelines.[30]  The NGA, however,

[24] 42 U.S.C. § 4332(c)(i) (1970).

[25] 42 U.S.C. § 4332(c)(i) (2023) (emphasis added).

[26] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) (*Public Citizen*).

[27] *See id*. at 767.

[28] *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017) (*Sabal Trail*).

[29] 15 U.S.C. § 717f.

[30] *See Sabal Trail*, 867 F.3d at 1373 ("Because FERC could deny a pipeline certificate on the ground that the pipeline would be too harmful to the environment, the agency is a 'legally relevant cause' of the direct and indirect environmental effects of pipelines it approves.  *Public Citizen* thus did not excuse FERC from considering these indirect effects.") (citation & footnote omitted).  I note, however, that *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* holds that even following a binding judicial issuance, agencies remain free in subsequent proceedings to offer reasonable interpretations of the jurisdiction conferred upon them by their organic statutes.  545 U.S. 967, 982-83 (2005) (*Brand X*).  This proposition, for better or for worse, is now black letter administrative law.  Far from flouting the authority of the courts, I suggest no more than that the Commission act within the remit confirmed in *Brand X* by offering a reasonable interpretation of our statute which would limit our jurisdiction consistent with the NGA's purpose and its plain text.  *See* 15 U.S.C. § 717(b) (listing the exemptions from the Commission's jurisdiction).  And we can do so secure in the knowledge that such an interpretation—again, for better or for worse—will be accorded the deference guaranteed by *Chevron*.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (*Chevron*) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a

Exhibit 1
Page 62 of 79

confers no authority upon FERC to regulate the end use or local distribution of natural gas.[31] Rather, when deciding whether to approve a pipeline, the Commission determines whether there is a demonstrated need for interstate natural gas transportation capacity. Based on this misunderstanding of FERC's authority, the *Sabal Trail* court concludes that FERC must include estimates of the GHG emissions from the end use of the gas or explain why it is unable to do so,[32] and goes even further, in *dicta*, to assert, without any explanation, that FERC has "legal authority to mitigate" the environmental effects that result from that end use.[33]

13.    This mistake provided one (albeit insufficient) rationale for the Commission's now-draft Updated Certificate Policy Statement[34] and Interim GHG Policy Statement,[35] which envisioned a mitigation scheme for the GHG emissions from the end use of gas transported on the interstate natural gas system.[36] The Builder Act offers the

permissible construction of the statute.") (footnote omitted).

[31] *See* 15 U.S.C. § 717(b) ("The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas*.") (emphasis added).

[32] *See Sabal Trail*, 867 F.3d at 1374 ("We conclude that the EIS for the Southeast Market Pipelines Project should have either given a quantitative estimate of the downstream greenhouse emissions that will result from burning the natural gas that the pipelines will transport *or explained more specifically why it could not have done so*.") (emphasis added); *id*. at 1375 ("Our discussion so far has explained that FERC must either quantify and consider the project's downstream carbon emissions *or explain in more detail why it cannot do so*.") (emphasis added).

[33] *Id.* at 1374.

[34] Updated Certificate Policy Statement, 178 FERC ¶ 61,107.

[35] Interim GHG Policy Statement, 178 FERC ¶ 61,108.

[36] *See* Order on Draft Policy Statements, 178 FERC ¶ 61,197 at P 2 (converting the Updated Certificate Policy Statement and the Interim GHG Policy Statement to "draft policy statements").

**Exhibit 1**
**Page 63 of 79**

Commission a rare opportunity to clarify the limits of its authority and move beyond the shadow that the now "draft" policy statements continue to cast over the development of critically needed natural gas infrastructure.

### B. The Downstream GHG Emissions are Not Reasonably Foreseeable.

14. Two of the shippers for the project are local distribution companies (LDCs).[37] Today's order finds that downstream emissions from the LDC shippers are reasonably foreseeable.[38] I dissent from this finding. Calculating the downstream GHG emissions based on a full burn calculation cannot accurately determine reasonably foreseeable GHG emissions.[39] And the downstream GHG emissions from LDCs are not reasonably foreseeable.

15. The Commission is obligated under the APA to engage in reasoned decision making. It is black letter law that reasoned decision making requires responding to the substance raised in litigants' submissions. My colleagues' insistence that all downstream

---

[37] *GTN*, 185 FERC ¶ 61,035 at P 19 ("GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest. The projected end use for this gas is residential, commercial, and industrial users. It states that Tourmaline is a producer of natural gas that will provide low-cost natural gas to West Coast markets serving residential, commercial, industrial, and electric generation needs.") (citations omitted).

[38] *See id.* P 64 ("[W]e find that the . . . downstream combustion emissions associated with the capacity subscribed by Cascade and Intermountain (together, 99,000 Dth/d) are reasonably foreseeable."); *id*. P 19 ("GTN states that Cascade and Intermountain are local distribution companies that need capacity to serve their growing customer base and load demands in the Pacific Northwest. The projected end use for this gas is residential, commercial, and industrial users.") (citations omitted). The Commission correctly finds that the downstream emissions for the capacity subscribed by Tourmaline (a producer) are not reasonably foreseeable. *See id*. P 64 n.120 ("Tourmaline is a natural gas producer and the end use for the natural gas which will be transported using its subscribed capacity is not known. Tourmaline has stated the gas is generally intended for West Coast markets. Therefore, the downstream emissions associated with the capacity are not reasonably foreseeable.") (citation omitted).

[39] GTN December 23, 2022 Comments on FEIS at 4 n.6 (explaining that "the actual Project emissions and downstream emissions will be lower" than a full burn calculation) (eLibrary Accession No. 20221223-5039).

**Exhibit 1**
**Page 64 of 79**

emissions from LDCs are reasonably foreseeable does not amount to reasoned decision making. An agency's decision is

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, *offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.*[40]

The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[41] The Commission must also base its decisions on substantial record evidence. Substantial evidence means "more than a mere scintilla," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[42]

16.    Nowhere in today's order does the Commission explain why it finds the full burn calculation an accurate basis upon which to estimate reasonably foreseeable downstream emissions. In GTN's application, GTN states that "[e]missions calculations assume all natural gas supplied is combusted, *which is not anticipated for the Project*."[43] And the Commission recognizes as much, stating that "[f]ull burn calculations are, in most cases, an overestimate because pipelines only operate at full capacity during limited periods of full demand."[44] Even still, the Commission appears to be establishing a new policy, *sub silentio*, in which, for LDC shippers, the Commission will find, as a categorical matter, and even in cases where the Commission has been presented with unrebutted, contrary record evidence, that a full burn calculation can be used to estimate reasonably

---

[40] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added).

[41] *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168 (1962)); *see also id.* at 56 ("failed to offer the rational connection between facts and judgment required to pass muster under the 'arbitrary and capricious' standard").

[42] *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

[43] Application at Resource Report 9, § 9.1.5 (emphasis added).

[44] *GTN*, 185 FERC ¶ 61,035 at P 64 n.122.

**Exhibit 1**
**Page 65 of 79**

foreseeable downstream GHG emissions.[45]  This is bad policy, it is factually unsupportable, and is a violation of the APA.[46]  It affirmatively misleads the public.

17.    Despite the insistence of my colleagues, past and present, that we have been instructed to find downstream emissions from LDC shippers to be reasonably foreseeable, the reality is that such a finding is not legally required.  As in *Food & Water Watch v. FERC*,[47] this case involves adding capacity to provide incremental transportation service to shippers, including LDCs.  In *Food & Water Watch*, the court did conclude "that the end use of the transported gas is reasonably foreseeable"[48] but

[45] *See Transcon. Gas Pipe Line Co., LLC*, 184 FERC ¶ 61,066 (Danly, Comm'r, dissenting in part at P 8) (disagreeing with the Commission that a full burn calculation of downstream GHG emissions reflects reasonably foreseeable GHG emissions and explaining that the applicant argued that a full burn estimate for downstream GHG emissions was "grossly inaccurate" and that a utilization rate of 38.6% should be used instead) (citation omitted); *see also N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (2023) (Danly, Comm'r, concurring in part & dissenting in part at P 16).  *Cf. Tenn. Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041, at PP 49-51 (2022) ("For the proposed project, we find that the construction emissions, direct operational emissions, and the emissions from the downstream combustion of the gas transported by the project are reasonably foreseeable emissions.  With respect to downstream emissions, the record in this proceeding demonstrates that the natural gas to be transported by the project will be combusted by end-use customers. . . .  With respect to downstream emissions, the EIS calculates a full-burn of the project's design capacity would result in 2.22 million metric tpy of $CO_2$e.  However, Tennessee urges the Commission to estimate the potential downstream GHG emissions using the 'average utilization rate' in the relevant market area on Tennessee's system, Zone 5, which Tennessee states has a 77% utilization rate.  We decline to accept Tennessee's 77% average utilization rate without additional substantiation, especially in light of the contradictory 85% historical utilization rate provided in Tennessee's application used to support its proposed commodity charge.  Based on an assumed 85% utilization rate, the estimated GHG emissions related to the downstream use of the incremental capacity provided by the project is approximately 1,887,000 metric tpy.").

[46] It is beyond cavil that an agency must explain its departure from prior precedent and "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.") (emphasis in original) (citation omitted).

[47] 28 F.4th 277 (D.C. Cir. 2022) (*Food & Water Watch*).

[48] 28 F.4th at 289.

**Exhibit 1**
**Page 66 of 79**

went on to state that "[o]n remand, *the Commission remains free to consider whether there is a reasonable end-use distinction* based on additional evidence, but it has not carried its burden before us at this stage," and the court explained that it "remand[ed] to the agency to perform a supplemental environmental assessment in which it must either quantify and consider the project's downstream carbon emissions *or explain in more detail why it cannot do so*."[49]  We have not yet acted on the *Food & Water Watch* remand and, even according to the court, the question remains open.  There are explanations that the Commission can—and should—rely upon to provide "a reasonable end-use distinction"[50] when the shippers are LDCs.[51]

---

[49] *Id.* (emphasis added).

[50] *Id.*

[51] The LDCs at issue here and the discrete, known generators in *Sierra Club v. FERC*, are dissimilar enough that the *Sabal Trail* precedent cannot directly apply.  *Sabal Trail*, 867 F.3d 1357.  Additionally, as I have said before, *Sabal Trail*, which *Food & Water Watch* applies, is inconsistent with the Supreme Court's holding in *Public Citizen*, 541 U.S. at 767 ("NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause.  The Court analogized this requirement to the 'familiar doctrine of proximate cause from tort law.'") (citation omitted); *see id.* at 770 (holding that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect" and "under NEPA and the implementing CEQ regulations, the agency need not consider these effects in its EA when determining whether its action is a 'major Federal action.'").  My views are not idiosyncratic.  Both the partial dissenting statement in *Sabal Trail* and the U.S. Court of Appeals for the Eleventh Circuit agree. *See* 867 F.3d at 1383 (Brown, J., concurring in part and dissenting in part) ("Thus, just as FERC in the [Department of Energy (DOE)] cases and the Federal Motor Carrier Safety Administration in *Public Citizen* did not have the legal power to prevent certain environmental effects, the Commission here has no authority to prevent the emission of greenhouse gases through newly-constructed or expanded power plants approved by the Board."); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1300 (11th Cir. 2019) ("[T]he legal analysis in *Sabal Trail* is questionable at best.  It fails to take seriously the rule of reason announced in *Public Citizen* or to account for the untenable consequences of its decision.").  Moreover, as I have previously explained, we could no more reasonably deny a pipeline for the effects of induced upstream production, which the statute places outside of our jurisdiction, than we could deny an NGA section 3 authorization, 15 U.S.C. § 717b, for an LNG export terminal because we do not like the effects that the expected exports would have on international gas markets.  *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 (2023) (Danly, Comm'r, concurring at P 5) (citing *Port Arthur LNG, LLC*, 181 FERC ¶ 61,024, at P 12

**Exhibit 1**
**Page 67 of 79**

& n.35 (2022) (stating in an extension of time proceeding that "[t]he Commission will not consider Sierra Club's assertion that we must examine the project's impact on domestic prices and supply as it is an attempt to re-litigate the issuance of the Authorization Order" and that "*[n]or could we consider impacts on domestic prices and supply as* the Commission's authority under the Natural Gas Act is limited to the authorization of the siting, construction, and operation of LNG export facilities, while *the consideration of the impact of export of LNG as a commodity is solely under the Department of Energy's authority*") (emphasis added) (citation omitted); *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143, at P 13 (2022) (*Commonwealth*) ("The Commission's authority under NGA section 3 applies 'only to the siting and the operation of the facilities necessary to accomplish an export[,]' while 'export decisions [are] squarely and exclusively within the [DOE]'s wheelhouse.' Similarly, issues related to the impacts of natural gas development and production are related to DOE's authorization of the export and not the Commission's siting of the facilities . . . .") (citations omitted); *Columbia Gulf Transmission, LLC*, 180 FERC ¶ 61,206, at PP 78, 80 (2022) (explaining for a NGA section 7 project that would provide incremental firm interstate natural gas transportation service to an LNG export facility that "the downstream GHG emissions are attributable to DOE's 'independent decision to allow exports—a decision over which the Commission has no regulatory authority'" and that "[w]e see no basis in the NGA for the Commission to encroach upon DOE's sole authority over the review and authorization of exports of natural gas"); *Tenn. Gas Pipeline Co., L.L.C.*, 180 FERC ¶ 61,205, at PP 62, 64 (2022) (same). That determination rests solely with the DOE, which is charged with authorizing "the export of natural gas as a commodity." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016) (explaining that the DOE has "exclusive authority over the export of natural gas as a commodity"). The same holds for any induced upstream effects on production, even if they *could* be found traceable to the proposed project. In my view, this also applies to downstream end use, such as local distribution. The statute reserves those powers to the states. And it does so explicitly:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

**Exhibit 1**
**Page 68 of 79**

18.    As a factual matter, it is impossible to find any LDC's downstream GHG emissions reasonably foreseeable based on a full burn calculation. Suggestions to the contrary demonstrate a total misunderstanding of how LDCs and the interstate natural gas pipeline system work and, worse, ignore the basis upon which LDCs contract for capacity.[52]

19.    Residential and commercial demand for natural gas is highly dependent upon weather. No LDC expects contracted capacity to match actual utilization rates. Typically, LDCs do not contract for capacity to meet routine needs but instead, because of their legal obligation to serve their customers at all times, under all conditions, they instead contract to meet *peak demand*.[53] They also contract for peak demand as a hedge

15 U.S.C. § 717(b).

[52] As an aside, were the Commission to find that downstream GHG emissions are not reasonably foreseeable or otherwise depart from using a full burn estimate of downstream GHG emissions such a decision would not undercut the Commission's need determination. Any suggestion along those lines is ridiculous. Here, we have a project that has significant evidence of need demonstrated by precedent agreements for the project's full capacity. The inquiry under NEPA as to whether the downstream GHG emissions are reasonably foreseeable has *nothing* to do with the need inquiry. As the Commission has explained, NEPA and the NGA are distinct. *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173, at P 37 (2023) ("[T]he Commission's NGA and NEPA responsibilities are separate and distinct.") (citation omitted); *Transcon. Gas Pipe Line Co., LLC*, 182 FERC ¶ 61,148 at P 101 ("The NGA analysis is distinct from the NEPA analysis . . . .").

[53] *See, e.g.*, Application at 11 ("Cascade serves areas in Washington and Oregon. Cascade currently has transportation contracts on GTN that provide 90 percent of Cascade's demand in Central Oregon. Cascade is faced with peak day supply shortfalls in Oregon, expected as early as 2024, as well as an annual average load growth rate of 2.12% in Zone GTN of Cascade's system, a collection of citygates served by GTN. The Project will create the needed incremental firm transportation capacity necessary for Cascade to serve its growing load demand requirements and address its peak day supply shortfalls. Additionally, with the incremental capacity created by the Project, Cascade will have a continuous firm transportation path from the supply source in Alberta, Canada to Cascade's service area. This allows Cascade to control supply at the source in order to meet peak day loads while also providing supply diversity to mitigate constraints on other transportation options."); *id.* at 12 ("Intermountain's service area is located in Southern Idaho and its residential and commercial customers are forecasted to grow at an annualized rate of 3.3%. Intermountain has recently restructured its interstate firm transportation capacity portfolio by replacing firm transportation capacity on the Northwest Pipeline from the Rockies to Idaho with firm transportation capacity from

**Exhibit 1**
**Page 69 of 79**

in order to avoid having to pay market prices at times of scarcity.  Such planning is more prudent than having local authorities pinning the reliability of their systems on rain dances and hopes for a mild winter.[54]

20.    The irony, of course, is that we need not luxuriate in the facts of this (or any other) case in order to decline to assess downstream GHG emissions.  In his prior separate statements, Commissioner Christie has pointed to the limits of our jurisdiction as the basis upon which to find that upstream GHG emissions are not reasonably foreseeable, arguing that upstream activities are non-jurisdictional; therefore, we have no legal obligation to either estimate the upstream GHG emissions or consider them.[55]  He is absolutely correct.  But the same logic applies, with equal force, to downstream GHG emissions.  The Commission has no jurisdiction over the LDCs.  Those are licensed and regulated by the states, and we should not consider the Commission to be the legal proximate cause of the GHG emissions of the gas ultimately used by their consumers.

### C.    The Commission Should Not Include Calculations of the Social Cost of GHGs in its Orders and Should Not Adopt Illogical Statements in Commission Staff's Environmental Documents

Northwest Pipeline's interconnect with GTN, located in Stanfield, Oregon, to Southern Idaho.  With its Project capacity, Intermountain will be able to secure firm transportation capacity on GTN, which will create a continuous firm transportation path from the supply source in Alberta, Canada to Intermountain's service area.  As with Cascade, this allows Intermountain to control supply at the source in order to meet peak day loads while also providing supply diversity to mitigate constraints on other transportation options.").

[54] *Cf. New England's Power Grid Prepared for Winter*, ISO New England (Dec. 5, 2022), https://www.iso-ne.com/static-assets/documents/2022/12/20221205_pr_winteroutlook_final.pdf ("Based on seasonal weather forecasts and information provided by generators about their fuel arrangements, the region's power system is prepared for mild and moderate weather conditions,' said Gordon van Welie, ISO New England's president and CEO.  'If long periods of severely cold weather develop, we'll lean on our forecasting tools to identify potential problems early enough to take proactive measures, such as calling for increased fuel deliveries or asking for public conservation.'").

[55] *See, e.g.*, *N. Nat. Gas Co.*, 184 FERC ¶ 61,186 (Christie, Comm'r, concurring at P 9) ("Today's order makes a finding of fact that the upstream GHG emissions are not reasonably foreseeable. . . .  [T]he Commission has no legal obligation to estimate emissions from upstream, non-jurisdictional activities anyway . . . .") (citation omitted).

**Exhibit 1**
**Page 70 of 79**

21.    I would not have included the calculations of the social cost of GHGs in the Commission's order.[56]  As I explained in my separate statement in *Boardwalk*, that issuance marked a change in the Commission's approach to the social cost of GHGs in its orders.[57]  In a break with this recent practice, *Boardwalk* and the orders voted on at the September 21, 2023 Commission meeting, while including language from the April Orders, *also* include calculations for the social cost of GHGs.[58]  I do not support their inclusion in this order both because their inclusion breaks with recent practice and

[56] *See GTN*, 185 FERC ¶ 61,035 at P 64.

[57] *See generally Boardwalk Storage Co., LLC*, 184 FERC ¶ 61,062 (2023) (*Boardwalk*) (Danly, Comm'r, concurring at PP 1-7).

[58] *See Boardwalk*, 184 FERC ¶ 61,062 at P 24.  Following the Commission's adoption at the April open meeting of our new social cost of GHGs language, our orders have not included those calculations when they have appeared in the Commission staff's environmental documents.  *See Equitrans, L.P.*, 183 FERC ¶ 61,200, at P 47 (2023) (*Equitrans*) (explaining that "[f]or informational purposes, Commission staff estimated the social cost of GHGs associated with reasonably foreseeable emissions from the project.").  Even before the April 20, 2023 Commission meeting, the calculations were not included in several orders where the environmental document already contained the calculations.  *See, e.g., Cameron LNG, LLC*, 182 FERC ¶ 61,173, at P 37 (2023) ("Further, the EA, for informational purposes, disclosed the social cost of GHGs associated with the project's reasonably foreseeable GHG emissions.") (footnote omitted); *Commonwealth,* 181 FERC ¶ 61,143 at P 75 (stating that "the final EIS disclosed the social cost of GHGs associated with the project's reasonably foreseeable GHG emissions" and not including the calculations in the order) (citation omitted).  I note that there are some inconsistencies in this prior to the issuance of the orders voted on at the April open meeting, with occasional orders including the calculations.  In every circumstance, though, I have objected to the inclusion of the social cost of GHGs calculations in our orders and will continue to do so.  Instead, the Commission has included the disclosure of the social cost of GHGs in its orders "for informational purposes" when those calculations were not included as part of the EAs or EISs or when the calculation in the staff's environmental document included (improperly) downstream emissions that are *not* reasonably foreseeable, *e.g.*, the downstream emissions from exports.  *See Tex. LNG Brownsville LLC*, 183 FERC ¶ 61,047 at P 24 (including the calculations in the remand order because they were not in the environmental document); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 at PP 98-99 (same); *Driftwood Pipeline LLC*, 183 FERC ¶ 61,049 at PP 57 nn.109 & 112, 61-62 (disclosing a "revised estimate of the social cost of GHGs associated with the reasonably foreseeable emissions" in the Commission's order because the calculation in the final EIS included in the calculation downstream GHG emissions from exports, which are not reasonably foreseeable).

**Exhibit 1**
**Page 71 of 79**

because the calculations are meaningless in light of the very finding, stated explicitly in the text of the Commission's order, that the social cost of GHGs cannot be used for any meaningful purpose to inform project-level analysis, including the assessment of significance. That is why those calculations are being disclosed solely "for informational purposes." Though I object to their inclusion, surplusage, even when *specifically declared* to be irrelevant to the reasoning of an order, is not, in itself, unlawful. The Commission has acknowledged, time and again, that the inclusion of these calculations in an environmental document is "[f]or informational purposes" only and has not included the calculations in several orders when they already appear in the NEPA document.[59] The Commission should not have changed course.

22.     Aside from the above, there is an obvious logical flaw in this order. Commission staff's Final EIS states that "[m]odifying and installing the Project facilities would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[60] My colleagues, in today's order, acknowledge this statement found in the Final EIS and then go on to state (in the order itself) that "[w]e clarify that, assuming that the transported gas is not displacing equal- or higher-emitting sources, we recognize that the project's contributions to GHG emissions globally contribute to future climate change impacts, including impacts in the region."[61]

23.     But the declaration that the project will "contribute to future climate change impacts" appears at the same time as we say that we have no means by which to assess the significance of GHG emissions. This is obviously problematic. First, it is unclear what, exactly, the majority means when it says that "the project's contributions to GHG emissions globally contribute to future climate change impacts." Second, this statement is only offered to respond to Commission staff's inclusion of statements in their NEPA documents indicating that the proposed project "would increase the atmospheric concentration of GHGs in combination with past, current, and future emissions from all other sources globally and contribute incrementally to future climate change impacts."[62] The reality of the matter is that staff has no idea whether that is the case. The Commission has declared as much. So why repeatedly include such statements? How

[59] *E.g.*, *Equitrans*, 183 FERC ¶ 61,200 at P 47.

[60] Final EIS at 4-47.

[61] *See GTN*, 185 FERC ¶ 61,035 at P 64 (citations omitted). I acknowledge that various formulations of this language have been included in orders that I have previously voted for, but I no longer support this language and object to its inclusion.

[62] Final EIS at 4-47.

**Exhibit 1**
**Page 72 of 79**

does such speculation inform the Commission's decision making?  Quite simply, it does not.

### D.    The Commission Must Apply the Appropriate Statutory Standard.

24.    Finally, I want to address the majority's statement that the project "is an environmentally acceptable action."[63]  Admittedly, this language has appeared in several prior orders, including orders for which I have voted.  I no longer support the inclusion of this language in the Commission's NGA authorizations because the standard under NGA section 7 is whether a proposed pipeline is in the present or future public convenience and necessity,[64] not whether the proposed project "is an environmentally acceptable action."[65]

### III.    Conclusion

25.    When drafting our orders we must bear in mind—at all times—fidelity to the law, the timely discharge of the duties assigned to us by Congress, and the legal durability of

---

[63] *GTN*, 185 FERC ¶ 61,035 at P 98 ("Based on our consideration of this information, as supplemented or clarified herein, we agree with the conclusions presented in the [F]inal EIS and find that the project, if implemented as described in the [F]inal EIS, and further addressed herein, is an environmentally acceptable action."); *id*. P 100 ("As noted above, the project is an environmentally acceptable action . . . .").

[64] *See* 15 U.S.C. § 717f(e) ("[A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied.").

[65] *Cf. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (explaining that "it would not have violated NEPA if the Forest Service, after complying with [NEPA's] procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd" and also explaining that "[o]ther statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action") (citations omitted).

**Exhibit 1**
**Page 73 of 79**

our issuances so as to ensure that the industry we are charged with overseeing can operate free of the burdens (and costs) of regulatory uncertainty and litigation risk.  Sadly, today's order falls short in all three respects.

      For these reasons, I respectfully concur in part and dissent in part.


_____

James P. Danly
Commissioner

**Exhibit 1**
**Page 74 of 79**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest, LLC                                Docket No.  CP22-2-000

(Issued October 23, 2023)

CLEMENTS, Commissioner, *concurring in part and dissenting in part*:

1.      I concur with the decision to issue a certificate of public convenience and necessity to Gas Transmission Northwest, LLC (GTN) for its GTN Xpress Project.[1]  I do so reluctantly because the states of Washington, Oregon, and California have raised serious questions concerning the present and future need for additional gas transportation service for customers in their states.  Unfortunately, the Commission's superficial approach to assessing the need for new gas infrastructure has left us with a skeletal administrative record that raises more questions than it answers concerning the need for the project.  Lacking a suitable policy framework or established procedures for fully evaluating the need issue, the Commission practically forces itself to rely solely on precedent agreements to find the GTN Xpress Project is needed.  As I recently explained in a similar case, the Commission's approach is becoming increasingly untenable as a combination of market forces and federal, state, and local climate protection policies signal potentially flat or declining demand for natural gas over time.[2]  The circumstances impacting the need for new pipeline capacity are far more complex than they were the Commission adopted its 1999 Certificate Policy Statement[3] and we should update the policy to address that complexity.  But today, given the Commission's governing precedents on determining need[4] and our failure to develop a complete record on the need issue in this case, I am compelled to concur in the Order's result.  However, as discussed below, I dissent from the Order's language claiming the Commission is unable to

---

        [1] *Gas Transmission Northwest, LLC,* 185 FERC ¶ 61,035 (2023) (Order).

        [2] *See Transcontinental Gas Pipe Line Company, LLC*, 182 FERC ¶ 61,006 (2023) (Clements, Comm'r, concurring).

        [3] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 17 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).

        [4] *See* Order at PP 26, 27, 31, 35 & cases cited at nn.59, 79.

**Exhibit 1**
**Page 75 of 79**

determine the significance of the environmental impacts caused by the project's greenhouse gas (GHG) emissions.[5]

2.      The Commission's 1999 Certificate Policy Statement calls on us to "consider all relevant factors reflecting on the need for the project."[6]  The Statement specifies that these factors "might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to customers, or a comparison of projected demand with the amount of capacity currently serving the market."[7]  Necessary evidence "will usually include a market study."[8]  With the conflicting arguments in this case concerning the need for the GTN XPress project, the Commission's decisional process would have greatly benefited from market studies focused on present and future demand for natural gas in the specific markets that the project would serve.  The Commission could have asked for those studies, as well as more specific information about the current and future effect of state laws, regulations, and public and private actions designed to reduce GHG emissions.  Unfortunately, the Commission did not do that, leaving us with many unanswered questions.

3.      The most critical unanswered question in the Commission's need analysis is what impact Washington, Oregon, and California's climate and energy policies will have on natural gas demand in the areas served by the GTN Xpress Project.  Those three states, and many cities within them, have implemented a suite of ambitious climate measures.[9]  The states have clearly stated their intention to transition to zero-emission electricity (over thirty percent of regional gas consumption today is used to generate electricity),[10] and state utility regulators have implemented policies anticipating declining gas use.[11]

---

[5] *See* Order at PP 71-72.

[6] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, at 17 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (1999 Certificate Policy Statement).

[7] *Id.*

[8] *Id.* at 19.

[9] Washington, Oregon, and California Aug. 22, 2022 Joint Motion to Intervene and Protest at Ex. A.

[10] Washington, Oregon, and California Sep. 21, 2022 Answer and Request for Leave to Respond and Motion to Reject at 12.

[11] Washington, Oregon, and California Aug. 22, 2022 Joint Motion to Intervene and Protest at 18.

**Exhibit 1**
**Page 76 of 79**

Unfortunately, the Commission is armed with neither the procedures, nor the data, nor seemingly the will, necessary to adequately assess how these state policies will impact need for the GTN Xpress Project in the specific markets it is designed to serve.

4.      The Commission's over-reliance on precedent agreements, though simple and expedient, prevents us from understanding the potential impact of climate-related laws and policies, as well as varied market factors, on natural gas demand and therefore on the need for new gas infrastructure.  In any given Natural Gas Act certificate matter, including this one, we have no meaningful ability to assess the risk of over-building and the concomitant risk of saddling ratepayers with the costs of underused facilities.  We have seen more frequent and active participation by states in our recent certificate proceedings as state climate policies have evolved, and we should expect that trend to continue.  The Commission should determine *as a matter of policy* how to consider and weigh relevant state laws, programs, and administrative determinations in future certificate proceedings.

5.      The Commission could readily address these deficiencies by adopting the need provisions of its draft revised Certificate Policy Statement issued in 2022.  Those provisions reaffirm the Commission's commitment to considering *all* relevant factors, provide for submission of information on the end use of the project's gas, encourage market studies for projects responding to increased demand, and detail other information relevant to the Commission's assessment of need.[12]  The draft revised Certificate Policy Statement also encourages applicants to "submit analyses showing how market trends as well as current and expected policy and regulatory developments would affect future need for the project."[13]

6.      The Commission could well deny a future section 7 certificate application if it became more inquisitive and considered evidence of need beyond precedent agreements. Congress expressly provided for denial in enacting the Natural Gas Act in 1938, when the pipeline industry was in its infancy and just beginning to build an interstate natural gas pipeline network.  Section 7(e) of the statute provides that the Commission must affirmatively find that a proposed project "is or will be required by the present or future public convenience and necessity; *otherwise such application shall be denied.*"[14]  Today, our country's interstate natural gas pipeline network spans more than 300,000 miles,[15]

---

[12] *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107, at PP 53-61 (2022) (draft revised Certificate Policy Statement).

[13] *Id.* at P 59.

[14] 15 U.S.C. § 717f(e) (emphasis added).

[15] *See Annual Report Mileage for Natural Gas Transmission & Gathering Systems*, Pipeline and Hazardous Materials Safety Administration (last updated Oct. 2,

**Exhibit 1**
**Page 77 of 79**

which is enough pipe to encircle the planet twelve times. To be sure, it is a good thing that the United States has such a robust natural gas pipeline system today. But the dramatic expansion of the pipeline system and the increasingly complex set of variables that bear on project need in 2023 should have made the Commission *more* discerning on the need question, not less, which has been the unfortunate consequence of our myopic focus on precedent agreements.

7.    Separately, I dissent from the Order's assertion that the Commission is incapable of determining the significance of GHG impacts.[16] As I have written before, the majority's insistence that there are no acceptable tools for determining the significance of GHG emissions remains unsupported and gains nothing through near-constant repetition in the Commission's recent orders issued under sections 3 and 7 of the Natural Gas Act. In my concurrence in *Transco*[17]*,* I explained the history of the language in Paragraphs 71 and 72 of the Order, which has come to be known as the "*Driftwood* compromise."[18] In *Driftwood,* the majority adopted unheralded new language declaring that there are no methods for assessing the significance of GHG emissions, and particularly criticizing the Social Cost of GHGs protocol.[19] I have dissented from this language in *Driftwood* and subsequent orders for two reasons: (1) it reflects a final Commission decision that it cannot determine the significance of GHG emissions, despite the fact the Commission has never responded to comments in the GHG Policy Statement docket[20] addressing methods for doing so; and (2) the language departs from previous Commission precedent without reasoned explanation, thereby violating the Administrative Procedure Act.[21] I dissent from Paragraphs 71 and 72 of this Order for the same reasons.

---

2023), https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-natural-gas-transmission-gathering-systems.

    [16] *See* Order at PP 71-72.

    [17] *See Transcon. Gas Pipe Line Co.,* 184 FERC ¶ 61,066 (2023) (Clements, Comm'r, concurring at PP 2-3) (*Transco*).

    [18] *See id.* (Phillips, Chairman, and Christie, Comm'r, concurring at PP 1-2).

    [19] *See Driftwood Pipeline LLC*, 183 FERC ¶ 61,049, at PP 61, 63 (2023) (*Driftwood*).

    [20] Docket No. PL21-3.

    [21] *See Driftwood*, 183 FERC ¶ 61,049 (Clements, Comm'r, dissenting at PP 2-3 & n.161); *see also Port Arthur LNG Phase II, LLC,* 184 FERC ¶ 61,184 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Venture Global Calcasieu Pass, LLC,* 184 FERC ¶ 61,185 (2023) (Clements, Comm'r, dissenting in part at PP 2-4)*; Northern Natural Gas*

**Exhibit 1**
**Page 78 of 79**

8.    As I have said before, I do not know whether the Social Cost of GHGs protocol or another tool can or should be used to determine significance.  That is because the Commission has not seriously studied the answer to that question.  Rather, the majority simply decided there is no acceptable method, with no explanation of why the Commission departed from the approach taken in earlier certificate orders.[22]  I reiterate that the Commission should decide the important unresolved issues relating to our assessment of GHG emissions through careful deliberation in a generic proceeding with full transparency.

For these reasons, I respectfully concur in part and dissent in part.


_____

Allison Clements
Commissioner


*Company,* 184 FERC ¶ 61,186 (2023) (Clements, Comm'r, dissenting in part at PP 2-3); *Texas Eastern Transmission, LP*, 184 FERC ¶ 61,187 (2023) (Clements, Comm'r, dissenting in part at PP 2-4); *Equitrans, L.P.*, 183 FERC ¶ 61,200 (2023) (Clements, Comm'r dissenting at PP 2-3); *Commonwealth LNG, LLC*, 183 FERC ¶ 61,173 (2023) (Clements, Comm'r, dissenting at PP 5-8); *Rio Grande LNG, LLC*, 183 FERC ¶ 61,046 (2023) (Clements, Comm'r, dissenting at PP 14-15); *Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (2023) (Clements, Comm'r, dissenting at PP 14-15).

[22] Before its decision in *Driftwood,* the Commission had explained that it was not determining the significance of GHG emissions because the issue of how to do so was under consideration in the GHG Policy Statement docket.  *See, e.g., Transcon. Gas Pipe Line Co.*, 182 FERC ¶ 61,006, at P 73 & n.174; *Columbia Gas Transmission, LLC*, 182 FERC ¶ 61,171, at P 46 & n.93 (2023).  To depart from prior precedent without explanation violates the Administrative Procedure Act. *See, e.g., West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) ("[T]he Commission cannot depart from [prior] rulings without providing a reasoned analysis. . . .") (citations omitted).

**Exhibit 1**
**Page 79 of 79**

# EXHIBIT 2

185 FERC ¶ 62,169
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Gas Transmission Northwest LLC                    Docket No. CP22-2-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(December 26, 2023)

Rehearing has been timely requested of the Commission's order issued on October 23, 2023, in this proceeding. *Gas Transmission Nw LLC*, 185 FERC ¶ 61,035 (2023). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.

**Exhibit 2**
**Page 1 of 1**